## THE STATE v. DARLING, Appellant.

**Division Two, November 20, 1906.**

1. **JUROR: Opinion: Newspaper Reports of Evidence.** A juror who states on his *voir dire* examination that he has formed an opinion as to defendant's guilt or innocence from reading newspaper reports and, being asked if the newspaper he read contained the evidence taken at the coroner's inquest and the preliminary hearing, answers, "I think so," is not incompetent, when he further says that he can give the defendant a fair and impartial trial under the evidence and the instructions, where the newspapers are not offered in evidence, and it is not shown that they contained an accurate statement of the evidence. The statement of the juror that he thinks they contained the evidence is a mere conclusion.

2. **MANSLAUGHTER, FOURTH DEGREE.** Manslaughter in the fourth degree is the intentional killing of a human being in a heat of passion on reasonable provocation, without malice and premeditation, and under circumstances which will not render the homicide justifiable or excusable.

3. **Evidence: Instruction.** Defendant and his co-indictee testified that the deceased applied opprobrious and insulting epithets to defendant, and said he ought to burst defendant's head with a wrench which he then took from his pocket; that he immediately started towards defendant, whereupon defendant reached down and was in the act of picking up a rock when deceased struck him with the wrench; that defendant then struck deceased with the rock, and they engaged in a combat. *Held,* that, under this evidence, defendant was entitled to an instruction on manslaughter in the fourth degree.

4. **DEFENDANT UNDER EIGHTEEN: Punishment.** A defendant under eighteen years of age, charged with a crime the punishment for which is death or imprisonment in the penitentiary for not less than ten years, is to be tried just as any other person committing such an offense, and, after conviction, the court, if satisfied that he is under eighteen, may, in its discretion, sentence him to the penitentiary or commit him to the reform school for boys. But the defendant in such case is not entitled to an instruction which tells the jury that they may commit him to the reform school.

5. **EVIDENCE: Improperly Admitted.** Defendant testified that he and co-indictees went to the house of one Carroll, where deceased lived and where the homicide occurred, for the purpose of ascertaining if Carroll needed a farm hand and if he would employ one of the co-indictees, and for the purpose, also, of ascertaining whether defendant and the other co-indictees could borrow a lister from Carroll. The evidence showed that Carroll had left his home and had passed along the road in front of the house where defendant and his co-indictees lived, and that defendant was at home at that time. The theory of the State was that defendant and his co-indictees knew, at the time they went to Carroll's home, that Carroll was not at home; and the State was permitted to introduce evidence tending to show that a person passing along the road in front of defendant's house would be in sight of a person at the house, for the distance of a quarter of a mile. *Held,* that this evidence was improperly admitted in the absence of evidence tending to show that defendant or his co-indictees saw or were in a position to see Carroll, or that he saw them or one of them as he passed the house.

State v. Darling.

6. **CONSPIRACY: Facts and Circumstances.** It is not necessary that a conspiracy be proved by direct and positive testimony, but it may be shown by facts and circumstances, the conduct of the parties, and their joint action before and leading up to its execution.

7. ———: **Evidence.** The evidence in this case is held sufficient to show a conspiracy on the part of defendant and his co-indictees to assault deceased.

8. ———: ———: **Province of Court and Jury.** It is for the court to say in the first place whether there is any evidence of a conspiracy, and for the jury to determine, under proper instructions, whether there is one, and its purpose.

9. ———: ———: **Declarations of Co-Indictee.** It was not error to permit the State to prove that one of defendant's co-indictees, in the absence of defendant, said, speaking of deceased, "He might work to-day, and he might not," since this statement tended to show a conspiracy between the parties to assault the deceased.

10. ———: **Threats: By Co-Indictee.** Threats made against deceased by a co-indictee of defendant, before the conspiracy was formed, were inadmissible against defendant.

11. **MURDER: Instruction for First Degree: Conviction of Second Degree.** A defendant convicted of murder in the second degree is in no position to complain of an instruction on murder in the first degree.

12. **THREATS: Instruction.** An instruction, numbered 11, set out in the statement of the opinion, held to correctly state the law on the subject of threats.

Appeal from Cooper Circuit Court.—*Hon. Wm. H. Martin*, Judge.

REVERSED AND REMANDED.

*W. V. Draffen* and *C. D. Corum* for appellant.

(1) Under the decisions of this State, a juror who has formed an opinion from having read the evidence taken at the coroner's inquest and at the preliminary hearing, as printed in a newspaper, is, as a matter of law, disqualified from serving as a juror. State

v. Foley, 144 Mo. 610; State v. Culler, 82 Mo. 623;
State v. Hulz, 106 Mo. 53. The decisions of other
States are in harmony with the law here. Greenfield
v. People, 74 N. Y. 277; Rice v. State, 9 Tenn. 432; Car-
roll v. State, 5 Neb. 31; Smith v. State, 5 Neb. 181; Peo-
ple v. McQuade, 48 Hun 620; Morton v. State, 1 Kan.
468. (2) The court erred in failing to instruct on man-
slaughter in the fourth degree. The testimony of de-
fendant and his brother warranted such instruction.
State v.McKenzie, 177 Mo. 712; State v. Garrison,
147 Mo. 557; State v. Weakley, 178 Mo. 423; State v.
Wensell, 98 Mo. 149; State v. Todd, 194 Mo. 396; State
v. Bulling, 105 Mo. 204; 2 Bishop's New Criminal Law,
sec. 704. (3) It is not the law of this State that a per-
son under the age of eighteen, convicted of murder in
the second degree, *shall* be punished the same as an
adult person. He "may be punished in the same man-
ner and to the same extent as provided by statute for
the punishment of persons over the age of eighteen."
But this is not the only punishment that may be meted
out to him by the jury. The court failed to give the de-
fendant the benefit of the minimum punishment that
might be assessed against him for the offense of which
he was convicted, and in failing so to do, committed er-
ror. R. S. 1899, sec. 7759; State v. Armstrong, 167 Mo.
271; State v. Gilbreath, 130 Mo. 504; (4) The trial
judge permitted the State to show that one passing
along the road which leads by the Darling home would
be in sight of a person at the Darling home for a quar-
ter of a mile. This evidence was most prejudicial to
the defendant. (5) The court committed error in per-
mitting the State to show by Mrs. Carroll that Dorvil
Burris, in speaking of Jeffress, said, "He might work
to-day and he might not." This statement was not
made in the presence or hearing of the defendant.
There is no evidence showing that the defendant con-
spired with Burris to do Jeffress any harm. The evi-

dence not only does not show a conspiracy between defendant and Burris, but it does not even tend to show that Burris was an accomplice.  (6)  Declarations not made during the progress of a common object, nor during the pendency of the criminal enterprise, are incompetent as evidence, and improperly admitted.  State v. Fredericks, 85 Mo. 149; State v. Duncan, 64 Mo. 263; State v. May, 142 Mo. 152; Greenleaf on Evidence, sec. 3; Wilson v. People, 94 Ill. 299; Ford v. State, 112 Ind. 373; State v. Grant, 86 Ia. 216; Cox v. State, 8 Tex. App. 254; Loggins v. State, 8 Tex. App. 434.  (7) The question whether in fact there was a conspiracy was one for the determination of the jury, and it ought to have been submitted to them for solution.  State v. Kennedy, 177 Mo. 131; State v. Ross, 29 Mo. 50.

*Herbert S. Hadley,* Attorney-General, *N. T. Gentry,* Assistant Attorney-General, and *Chas. W. Journey* for the State.

(1)  No error was committed in the selection of the jurors.  While some of them stated that they had formed an opinion from reading what purported to be the evidence taken before the coroner and the committing magistrate, and formed an opinion from newspaper reports and rumor, yet they all further stated that they could and would try the defendant according to the law and the evidence.  Under the former rulings of this court the jurors were qualified.  State v. Cunningham, 100 Mo. 388;  State v. Core,  70 Mo.  493; State v. Hunt, 141 Mo. 630;  State v. Duffy, 124 Mo. 8; State v. Walton, 78 Mo. 270;  State v. Brennan, 164 Mo. 487.  Whether the purported testimony was a true copy of the testimony taken in the case does not appear from the record, and the newspaper accounts of said evidence were not offered in evidence.  Where it is not made to appear that the reports read in a newspaper were either a literal or substantial

·report of the evidence given in the trial, such printed statements must be regarded simply as rumors and newspaper reports. State v. Robinson, 117 Mo. 659; State v. Shackleford, 148 Mo. 493; State v. Reed, 137 Mo. 131. (2) No error was committed in failing to instruct the jury on manslaughter in the fourth degree. If the State's evidence is true, the defendant was clearly guilty of murder in the first degree; if the defendant's evidence was true, then he was guilty of no offense. In this condition of the evidence there was no half-way ground, and the court properly declined to instruct the jury on manslaughter in the fourth degree. State v. Bailey, 190 Mo. 257. (3) No error was committed in allowing State's witness Burris to testify to the effect that the defendant's house was in plain view of the public road. (4) A conspiracy need not be proved by direct and positive testimony, but may be inferred from the circumstances and conduct of the parties, their joint action and their presence at the time of the organization of the conspiracy and at the time of the execution of the same. Wharton's Crim. Law, sec. 1389; Wharton on Crim. Ev., sec. 298; 2 Bishop's Crim. Proc., sec. 227; People v. Childs, 127 Cal. 363; State v. Scott, 30 Ala. 503; State v. Gooch, 105 Mo. 396; State v. Valle, 164 Mo. 551; Gibson v. State, 89 Ala. 128; Spies v. People, 122 Ill. 170; 3 Greenleaf on Evidence, sec. 93; State v. Walker, 98 Mo. 104. (5) No error was committed in permitting the State to prove by Mrs. Carroll that Dorvil Burris said, in speaking of the deceased: "He might work to-day, and he might not." Everything done and said by the various parties to a conspiracy during the time of the existence of the conspiracy, whether said in the presence of each other or not, is admissible. 4 Elliott on Evidence, secs. 2941-3; 2 Wigmore on Evidence, sec. 1079. (6) Defendant having been convicted of an offense less than the one he is really guilty of, is a matter about which

he cannot complain.   State v. Todd, 194 Mo. 337; sec. 2369, R. S. 1899.

BURGESS, P. J.—The defendant, his brother, Silas Darling, and Dorvil Burris were jointly charged, in an information filed by the prosecuting attorney of Cooper county, with murder in the second degree, in killing with a dangerous and deadly weapon, to-wit, a large stone, one Samuel Jeffress at Cooper county on the 13th day of March, 1905. The cause was set for trial on the 10th day of July, 1905, when by permission of the court the State amended the information so as to charge said Darling and Burris with murder in the first degree.   Thereupon Burris pleaded guilty to manslaughter under said information, and was sentenced to two years imprisonment in the penitentiary, and was paroled by the court on the condition that he would not violate the law.

The defendants Ernest and Silas Darling then requested a severance, and that the State be required to elect as to which one of them it would try first.

The State then elected to try Ernest Darling first and the trial was proceeded with, resulting in a verdict of guilty of murder in the second degree, and the fixing of defendant's punishment at twenty years imprisonment in the penitentiary.

After unsuccessful motions for a new trial and in arrest, defendant appeals.

The facts are substantially as follows: The defendant and Silas Darling are brothers, and at the time of the homicide lived with their father on a farm in Cooper county between Blackwater and the Saline county line.   Dorvil Burris also lived with and worked for the father of the Darling boys.   Prior to March 13, 1905, the deceased lived with his widowed mother in the village of Nelson, which is a few miles from Blackwater, but on that day went to work for one Charles Carroll as a farm hand, the farm being situated in Cooper

county.  On the afternoon of the day preceding, being
Sunday, Emmett Yeager visited at the Darling home
and told the defendant that Sam Jeffress had gone to
work for Charles Carroll as a farm hand.  In a short
while Dorvil Burris came in, and defendant said to
him, "Dorvil, Sam Jeffress is going to work down here
at Charlie Carroll's and I will get the son-of-a-bitch in
the morning."  Dorvil replied that that was all right,
and that he would like to slip along behind and see
it done.  Presently Silas Darling came in the room,
and defendant repeated his remarks to  Silas, at the
same time changing a small pair of iron knucks from
his pocket to Silas's pocket, and getting a large pair of
iron knucks from Silas's pocket and putting same in his
(defendant's) pocket.  From the Darling home de-
fendant and Emmett Yeager went to visit Miss Mollie
Finley, who lived in the neighborhood.  While making
this call, defendant asked Miss Finley if she knew Sam
Jeffress, to which she replied that she did, and that
she thought he was a pretty good-looking boy.  Defend-
ant said, "Yes, he is a pretty good-looking boy, but he
probably won't look as well to-morrow as he does to-
day."  While returning from the Finley home defend-
ant told Emmett Yeager, "I told Sam while he was
cussing me there in Blackwater that I would get my
revenge, and by God, I will get it, too."  That after-
noon Silas Darling said to Dorvil Burris that he
thought he (Silas) ought to go down there with defend-
ant the next day, as Sam might make a knife play.

After dinner on Monday, March 13th, Mr. Carroll
took the deceased to a field and started him to work
with a pair of mules and a tongueless cultivator.  About
the same time, over at the Darling farm, Dorvil Burris
asked Silas to come and go with him to work, to which
Silas replied that he had promised defendant to go
with him down to Carroll's, and that he ought to come
on up to the barn and decide on it.  The three then met
at the barn and had a talk.  Dorvil said that he thought

they ought to wait until some time and catch Sam out on the road, but defendant replied, "No, if I don't get him, God damn him, this time, I will never get him; I don't want to put it off any longer." Silas joined in with defendant's idea of going at once, and in three or four minutes the three had started for the Carroll farm. As defendant and Silas left home they walked toward and within a few feet of a pile of old iron. As they passed the residence of one Charles Platt, they told Mr. Platt that they were going duck hunting, and asked if there were any ducks on the Lamine river. On the way Silas said to defendant, "I will fix it, I will ask Mr. Carroll to borrow a lister, and if he is not there, I will ask Mrs. Carroll." It was then agreed that Silas should do the talking to the Carrolls. Defendant also suggested that, in case they found Sam working with a hoe or mowing blade, they would have to call him away from it, as he might hurt one of them. Defendant further said, "It will be a hell of a joke if he has gone to town and quit his job." When they got near the Carroll home Silas went up to the house and asked Mrs. Carroll where her husband was; and she told him that he had gone to town, and would not be back till four or five o'clock. Silas then said that he would go down on the river and wait, and perhaps he would see him on the way home. The undisputed evidence showed that there was no road leading from Blackwater along the river to the Carroll home, and that this interview with Mrs. Carroll occurred about one o'clock p. m. As defendant and the others walked away from Mrs. Carroll, defendant told Dorvil Burris to go back and ask Mrs. Carroll if her husband wanted to hire a hand, "but not to mention Sam's name." Dorvil went back and spoke to Mrs. Carroll. She told him that her husband had Sam Jeffress and another man working for him then, but that he might hire another. Burris then joined defendant and Silas, reported that Sam Jeffress was still working there, and the three went up the river to a turn,

when they left it and went across a wheat field towards where deceased was at work. Defendant discovered deceased, and he suggested to the others that they climb the fences, two in number, in order to get into the field where deceased was at work. Defendant went in the lead, and up behind deceased; and Dorvil and Silas went in front of the team, sat down on a stump, and began talking to deceased. At that time deceased was facing the two and talking to them; he was leaning against the handles of the cultivator, and had his arms folded. Without a word being spoken by deceased to defendant or by defendant to deceased, defendant came up from behind and struck deceased on the head. The blow felled deceased to the ground when defendant struck him seven more times. The only movement that deceased made was to turn around a little as defendant struck him. As defendant was striking deceased he said, "Got enough, God damn you, got enough?" When deceased called out, "Enough," defendant quit striking; and it was then discovered that defendant had a short bar of iron in his hand, which he put back in his hip pocket. Dorvil Burris came up and suggested that they get some water to wash deceased's face; but Silas Darling said it would be best to turn the mules loose, so that people would think that they had run off and in that way hurt deceased. Dorvil Burris lifted deceased up off the ground and held his head; and about that time William Spry was passing along the field, and came to where the four boys were. Mr. Spry asked what was the matter and why deceased was bleeding, to which Silas Darling replied, "Sam and Ernest had a little fight." Defendant, who was standing ten feet away, said, "Sam has been bullying around Blackwater long enough, and damn him, let him bleed." As the deceased was too weak to walk and too weak to ride one of the mules, Mr. Spry sent Silas Darling to

the Carroll house for a wagon. As soon as he returned with the wagon, the deceased was placed in the wagon and driven to the house; and in removing him from the wagon, it was discovered that he was dead. A paddle and a monkey wrench were in the pocket of deceased, and were discovered after his death. On the ground near the cultivator handles were two puddles of blood; but the ground near there did not indicate that there had been any struggle. On the way to the house defendant met Emmett Yeager, and in reply to a question why he looked so pale, defendant said: "I have been in a little scrap with Sam Jeffress." Yeager asked him if Sam was hurt, to which defendant replied that he didn't think so. Defendant also said, "They have sent for a doctor, but I don't think they will need one." In reply to another question, as to whether or not deceased had any weapons, defendant said, "Nothing but a monkey wrench, and I didn't give the God damn son-of-a-bitch time to use that." Defendant got a drink of water at the spring and washed his hands. He afterwards stated to Yeager that deceased hollowed after the second lick, and the defendant said: "Holler, 'Enough,' you son-of-a-bitch, and after the third lick he hollered, 'Enough.' " After urging Yeager not to tell, defendant separated from him and went toward the Carroll house.

Dr. E. A. Wilson, who examined the body of the deceased, testified that he found one wound three inches long under the superior bone, and one wound three inches long to the right of the superior bone, one on the right bone of the head, another just a little below and a little bit forward, about one inch and a quarter long, and a fourth wound still further forward on the head; all of which wounds fractured the skull. A fifth wound was found just over the eye, a sixth below the eye and a seventh across the nose. He testified that these wounds produced the death of Sam Jeffress, and that

they were made by some kind of blunt instrument. The physician further testified that it was possible that said wounds could have been made with a rock, a peculiarly shaped rock with a straight edge, as the wounds produced were clean cuts. He further testified that it would have been possible for said wounds to have been produced with a bar of iron, a triangular-shaped piece of iron. The undertaker testified that he found eight wounds upon the head of the deceased; three in the back of the head, one in the forehead, one just below the edge of the hair, one on the right of the head, and one across the nose.

The evidence upon the part of the defendant tended to show that deceased was of a violent temper. That during the month of December, 1904, or January, 1905, the defendant was in the town of Blackwater and met the deceased there who insulted and abused him with his tongue, calling him vile names, and said that if defendant ever crossed his path he would find his guts lying in the street. To another witness he said that if Ernest Darling monkeyed with him, he would cut his heart out and show it to him. Deceased and the defendant did not meet again until the time of the homicide.

The evidence for defendant also tended to show that he did not make the statement to Dorvil Burris and others that he intended to kill Sam Jeffress; that he went down to Mr. Carroll's house on the day of the killing for the purpose of getting a lister, and that Dorvil Burris went along to see if he could get employment. When they reached there, they found Mr. Carroll was not at home, and that the three (defendant, his brother and Dorvil Burris) started round the road in order to meet Mr. Carroll when he came home. The defendant further testified that he did not know the deceased was in the field until he met him, and that he walked out in the plowed ground to see how deceased was doing the work, and also to inquire if Mr. Car-

roll wanted another hand; that Dorvil Burris went in front, Silas Darling was next, and the defendant was last; that after talking a little while about the rocky ground and the plow shovels being rusted, Dorvil Burris said he came down to get a job. Deceased then said, "What are you doing roving around through the country, you God damn son-of-a-bitch?" At the same time deceased threw the lines off his shoulders and started at defendant with a monkey wrench, threatening to crack his head. After deceased came toward defendant two or three steps, defendant reached down to get a rock, picked up a rock and struck deceased. That deceased struck defendant two or three times on the arm with the monkey wrench; defendant continued to hit deceased on the face with the rock and then on the head, until finally he knocked deceased to the ground. Defendant further testified that in the fight deceased took hold of him and got his arms around defendant's shoulders. After striking deceased several times, deceased said, "Enough," and defendant never hit him any more. Defendant denied having any piece of iron, and insisted that he struck deceased for the purpose of protecting his life. Defendant denied making the statement to Emmett Yeager, either before or after the killing of deceased. There was evidence tending to show that defendant enjoyed a good reputation prior to this difficulty, and that he and the deceased had had some prior trouble in the town of Blackwater.

In rebuttal, the State proved that there were no rocks on the ground near where this difficulty occurred on the day after its occurrence; but that several days later there were four or five rocks found there.

The court instructed the jury as follows:

"The information in this case, filed on the 16th day of May, 1905, charges defendant with the crime of murder in the first degree. To this charge defendant pleads not guilty. In making up your verdict in this

case the jury will be governed by the instructions given by the court, as follows:

"The information in this case is a mere formal accusation against the defendant. It is no evidence of his guilt, and no juror should permit himself to be influenced against the defendant because or on account of said information.

"The law presumes the defendant to be innocent, and this presumption of innocence attends him throughout the trial, until his guilt is established by the evidence beyond a reasonable doubt.

"If, therefore, upon a consideration of all the evidence, you have a reasonable doubt of the guilt of defendant, you should acquit him, but a doubt to authorize an acquittal on that ground should be a substantial doubt touching the guilt of the defendant, and not a mere possibility of his innocence.

"2. If you find from the evidence in this case, beyond a reasonable doubt, that at the county of Cooper and State of Missouri, at any time prior to the filing of the information herein, the defendant Ernest Darling, with a large stone, or a piece of iron, or any instrument or weapon likely to produce death or great bodily harm, as charged in the information and that such stone, piece of iron or other instrument or weapon was a dangerous and deadly weapon, did willfully, deliberately, premeditatedly and of his malice aforethought, strike, beat, bruise and wound Samuel Jeffress, thereby inflicting upon the head of him, the said Samuel Jeffress, one or more mortal wounds, from which said wounds the said Samuel Jeffress, on the 13th day of March, 1905, at the county of Cooper and State of Missouri, died, then you will find the defendant guilty of murder in the first degree.

"If you find the defendant guilty of murder in the first degree you will simply so state in your verdict, and assess no punishment. To the court remains the responsibility of assessing the punishment in such case.

"3. As used in these instructions, the term 'wilfully' means intentionally, that is, not accidentally.

" 'Deliberately' means in a cool state of the blood. It does not mean brooded over or reflected upon for a week or a day or an hour, but it means a conscious purpose to kill, formed in a cool state of the blood, and not under a violent passion suddenly aroused by some real or supposed grievance.

" 'Premeditatedly' means thought of beforehand for any length of time, however short.

" 'Malice,' in its legal sense, does not mean mere spite or ill-will, as ordinarily understood, but it means the intentional doing of a wrongful act, that condition of mind which prompts one person to take the life of another without just cause or justification, and it signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief.

" 'Aforethought' means thought of beforehand.

"4. He who wilfully, that is, intentionally, uses upon another at some vital point a deadly weapon, must in the absence of qualifying facts, be presumed to know that the effect is likely to be death, and knowing this, must be presumed to intend death, which is the probable consequence of such an act; and if such deadly weapon is used without just cause or provocation, he must be presumed to do it wickedly and from a bad heart.

"If, therefore, you find from the evidence in this cause that the defendant killed Samuel Jeffress by striking him upon a vital part with a dangerous and deadly weapon with a manifest design to use such weapon upon him with sufficient time to deliberate and fully form the conscious purpose to kill, then such killing is murder in the first degree.

"And while it devolves upon the State to prove the wilfulness, deliberation, premeditation and malice aforethought, all of which are necessary to constitute murder in the first degree, yet, these need not be

proved by direct evidence, but may be deduced from all the facts and circumstances attending the killing, and if you can satisfactorily and reasonably infer their existence from all the evidence, you will be warranted in finding the defendant guilty of murder in the first degree.

"5. Murder in the second degree has all of the elements of murder in the first degree, except that of deliberation.

"If you find from the evidence in this case that the defendant at the county of Cooper and State of Missouri, on the 13th day of March, 1905, wilfully, premeditatedly and of his malice aforethought (but without deliberation, as defined in these instructions) struck and killed Samuel Jeffress with a large stone, or a piece of iron, or any instrument or weapon likely to produce death or great bodily harm, as charged in the information, and that such stone, piece of iron, or other instrument or weapon was a dangerous and deadly weapon, then you should find the defendant guilty of murder in the second degree. If you find the defendant guilty of murder in the second degree, as defined in these instructions, you should assess his punishment at imprisonment in the penitentiary for any term of not less than ten years.

"6. The information in this case jointly charges the witness, Dorvil Burris, and defendant with the killing of Samuel Jeffress. The testimony of an accomplice in crime, that is, a person who actually commits, or participates in the crime, is admissible. Yet the evidence of an accomplice in crime, when not corroborated by some person or persons, not implicated in the crime, as to matters material to the issue, that is, matters connecting the defendant with the commission of the crime, as charged against him, and identifying him as the perpetrator thereof, ought to be received with great caution by the jury, and the jury ought to be sat-

isfied of its truth before they should convict the defendant on such testimony.

"The jury may convict the defendant on the uncorroborated testimony of an accomplice alone if you believe the statements given by such accomplice in his testimony to be true, if you further believe that the state of facts testified to by such witness, if any, is sufficient to establish the guilt of the defendant.

"7. Any verbal statements or admissions made by the defendant and which have been proven in this case may be taken into consideration by you, together with all other facts and circumstances detailed in evidence. What the proof may show you, if anything, that the defendant has said against himself the law presumes to be true, because said against himself; but anything you may believe from the evidence that defendant said in his own behalf you are not obliged to believe, but you may treat the same as true or false, when considered with a view to all the other facts and circumstances in the case.

"8. The defendant is a competent witness in the case, and in arriving at your verdict you must consider his testimony, but in determining what weight and credibility you will give to his testimony you may take into consideration the fact that he is the accused party on trial, testifying in his own behalf, and the interest he has in the result of this trial.

"9. You are the sole judges of the credibility of the witnesses and the weight to be given to the testimony of each witness. In determining the credit you will give to any witness who has testified in this case, and the weight you will attach to the testimony of such witness, you should take into consideration the conduct and demeanor of the witness upon the stand, the interest, if any, such witness may have in the result of the trial, the motive actuating the witness in testifying, his or her relation to or feelings for or against the defendant, the probability or improbability of the state-

ment of such witness, the opportunity the witness had
to observe and to be informed as to the matters about
which such witness has testified, and the inclination of
the witness to speak truthfully or otherwise as to mat-
ters within his or her knowledge. All these matters, to-
gether with all other facts and circumstances detailed
in evidence, should be taken into consideration by you,
and it is your province to give to the testimony of each
witness such value and weight as you may deem
proper. If upon a consideration of all the evidence you
conclude that any witness has intentionally sworn
falsely as to any material matter involved in this case,
you are at liberty to reject the whole or any part of the
testimony of such witness.

"10. The evidence offered touching the character
of the deceased should be considered by the jury in de-
termining whether or not by his acts and conduct at
the time of the homicide Jeffress, deceased, gave the
defendant reasonable cause to apprehend such danger
as to justify defendant in striking him, if he did strike
him, on the ground of self-defense, as defined in these
instructions. But if you find from the evidence that
the defendant was the aggressor, that he sought the de-
ceased and provoked, began or entered into a difficulty
with him with a preconceived intent of wreaking his
malice upon said Jeffress, then the bad character of
Jeffress, if he was a person of bad character, would af-
ford the defendant no excuse for taking his life, if he
did take his life, because it is the same offense to kill
a bad person as it is to kill a good one.

"11. If, from the evidence in this case, the jury
have a doubt as to whether defendant, Ernest Darling,
or Samuel Jeffress was the agressor in the difficulty in
which Jeffress lost his life, then in determining who
was the aggressor you may take into consideration any
threat or threats you may find were made by said
Jeffress against said defendant, and which threats were
not communicated to said defendant, for the purpose of

explaining the conduct and demeanor of said Jeffress at the time of said difficulty.

"If you find from the evidence that Samuel Jeffress, prior to the tragedy, made any threat against the defendant, Ernest Darling, and that such threats were communicated to said defendant, or that he made any threats to defendant himself, then such threat or threats, if any, so made and communicated to said defendant, should be considered by you as explaining the conduct or apprehensions of said defendant, if any, at the time of such killing.

"On the other hand, if you find from the evidence that said defendant, Darling, was the aggressor, and at the time he struck said Jeffress, if he did strike him, said Jeffress was not assaulting or attempting to assault said defendant, was not making any hostile or apparently hostile demonstrations toward defendant, and was making no effort to carry out such threat or threats, then such threat or threats would not excuse or justify defendant in killing deceased, if he did kill him, and so finding, you will disregard and not in any manner consider the evidence of such threats made by the deceased against said defendant in arriving at your verdict.

"12. The law guarantees to every man the right of self-defense, and if defendant killed Jeffress in the necessary defense of his person, he is not guilty. If, therefore, you find from the evidence that the defendant struck Jeffress with some instrument which resulted in the death of said Jeffress, and at the time defendant struck deceased he had good reason to believe, and did believe, from the conduct, manner or appearance of deceased, that the deceased was about to inflict upon him some great personal injury, and defendant struck him for the purpose of averting such apprehended injury, then you must acquit defendant on the ground of self-defense. In such case it is not necessary that the danger should have been real and about to fall.

All that is necessary is that the defendant believed and had good reason to believe that such danger existed; on the other hand, it is not enough that the defendant believed in the existence of such danger, but he must have had good cause for so believing before he can be acquitted on the ground of self-defense.

"If, however, you find from the evidence, beyond a reasonable doubt, that defendant, prior to the killing of Jeffress, had formed a design to kill said Jeffress or to do him some great personal injury, and to carry out such design the defendant armed himself with a deadly weapon and sought said Jeffress, and provoked, brought on or entered into a difficulty with said Jeffress, which resulted in his death, for the purpose of wreaking his vengeance or malice upon said Jeffress, or for the purpose of taking the life of said Jeffress or doing him some great bodily harm, then there is no self-defense in this case, however imminent the peril of defendant may have become in consequence of an attack made upon him by the deceased; and if, in such circumstances, you believe defendant killed said Jeffress, then he is guilty of murder in the first degree."

The court, at the request of the defendant, gave to the jury the following instructions, to-wit:

"A. If you believe from the evidence that at the time of the striking of Samuel Jeffress the defendant was in a violent passion, suddenly aroused in consequence of opprobious epithets applied to him or because of offensive, insulting or degrading language addressed to him by the deceased, and that while under said violent passion he did strike and kill the said Samuel Jeffress, then such killing was done without deliberation, and the defendant is guilty of no higher offense than murder in the second degree, and you should so find, unless you further believe from the evidence that the defendant was justified in taking the life of

said Jeffress on the grounds of self-defense, as defined in other instructions.

"B. If the jury believe from the evidence that the deceased was of a rash, violent and turbulent disposition, and that the defendant had knowledge of such disposition, then it is a circumstance for the consideration of the jury in considering the reasonable cause for defendant's apprehension of great personal injury to himself."

The defendant excepted to the action of the court in giving the instructions numbered one, two, three, four, six, seven, eight, nine, ten, eleven and twelve, and each of them, given on behalf of the State, and to the failure of the court to instruct on all the law of the case, and particularly excepts to the action of the court in failing to give an instruction on the question of manslaughter in the fourth degree, and the punishment that might be assessed.

The first point insisted upon by defendant for a reversal of the judgment is the action of the court in retaining upon the panel of forty jurors and upon the jury who sat upon the trial of the cause, incompetent jurors, over the objection and exception of defendant. Among those especially complained of is one G. W. Taliaferro, who was one of the trial jury. His *voir dire* examination is as follows:

Examination by Mr. Corum, counsel for defendant:

Q. Have you formed or expressed an opinion as to the guilt or innocence of this defendant? A. Yes, sir, I have.

Q. From what did you form that opinion? A. Well, from newspaper reports that I read.

Q. What newspapers did you read? A. Most all of the county papers.

Q. They printed the evidence that was taken at the coroner's inquest and the evidence that was taken at the preliminary hearing? A. I think so.

Q. The newspapers had a pretty extensive statement about that homicide? A. I think so.

Q. And from reading these papers you have formed an opinion as to the guilt or innocence of this defendant? A. Yes, sir.

Q. Have you that opinion now? A. Yes, sir.

Q. Did you express that opinion to anyone? A. Why, I think I did.

Mr. Corum: We object to Mr. Taliaferro as a competent juror in this case because he has read statements of the evidence in the papers taken at the coroner's inquest and the preliminary hearing herein and has formed and expressed an opinion thereon as to the defendant's guilt or innocence.

The Court: Objection overruled. To which action and ruling of the court the defendant then and there excepted at the time.

Further examination by State:

Q. Mr. Taliaferro, would that opinion bias or prejudice you if you were chosen to sit as a juror in the case? A. Well, I don't believe it would; I base my opinion on what I have read; of course, I have only heard one side of it.

By the Court: Q. Mr. Taliaferro, do you know anything else save what the newspapers stated? A. No, sir.

Q. What opinion you have is based on that report, assuming it to be correct? A. Yes, sir.

Q. You say that you have no bias or prejudice against the defendant? A. No, sir.

Q. Do you know the defendant? A. No, sir.

Q. Did you know the deceased? A. No, sir.

Q. Do you think you can give the defendant a fair and impartial trial? A. Why, I think I can.

Mr. Corum: We renew the objection to juror George W. Taliaferro.

The Court: Objection overruled. To which ruling of the court the defendant then and there excepted.

Upon the *voir dire* examination of R. P. Edwards, another of the forty, the following occurred:

Mr. Corum, counsel for defendant: Q. Mr. R. P. Edwards, have you formed or expressed an opinion as to the guilt or innocence of the defendant? A. I guess I have.

Q. Upon what did you form that opinion? A. Upon what I read in the newspapers.

Q. What newspapers? A. The Bunceton Eagle, for one, I think.

Q. That paper contained a full and comprehensive statement of the evidence taken at the coroner's inquest and preliminary hearing, did it? A. I think so.

Q. Did you read about the killing in any other newspaper besides that? A. Not unless it was in the Republic.

Q. And having read that statement of the evidence in the Bunceton Eagle, you formed an opinion as to the defendant's guilt or innocence? A. Yes, sir, I formed an opinion when I read it.

Q. And you have that opinion now? A. Yes, sir, I suppose about the same.

By the Court: Q. Did you ever hear any of the witnesses talk about the case? A. No, sir.

Q. Did you ever hear anybody who pretended to know the facts talk about the case? A. No, sir.

Q. Do you know anything about the case aside from what you read in the newspapers? A. I don't know anything at all except what I have read.

Q. You say that you did have an opinion; do you mean the impression that the newspaper left on your mind? A. Yes, sir, nothing else.

Q. Have you any prejudice or bias against the defendant? A. No, sir.

Q. If you were selected as a juror to try the case, could you give the defendant a fair and impartial trial

under the evidence and the instructions of the court. A. Yes, sir, I think so.

Mr. Corum: Q. What do you mean when you say you have no bias or prejudice against the defendant? A. I don't know anything about the man at all except what I have read.

Q. Do you mean to say that you have no ill-will or malice against him? A. No, I have no ill-will at all.

Q. And that is what you mean to say when you say you have no ill-will or bias against the defendant? A. Yes, sir.

Mr. Corum: We object to R. P. Edwards as a juror for the reason that he has formed an opinion from reading the published statements of the evidence taken at the coroner's inquest and the preliminary hearing which were had in this matter.

The Court: Objection overruled. To which action and ruling of the court, the defendant then and there duly excepted.

The *voir dire* examination of Mr. Ellis, another of the forty and of the twelve jurors who tried the case, was as follows:

Q. Mr. Ellis, have you an opinion as to the defendant's guilt or innocence? A. Yes, sir.

Q. What occasioned you to form that opinion? A. By what I have read in the newspapers.

Q. Did the papers which you read give a detailed statement of that part of the evidence that was taken at the coroner's inquest? A. They did.

Q. And at the preliminary hearing? A. Yes, sir.

Q. And having read these statements in the papers you have formed an opinion as to the defendant's guilt or innocence? A. Yes, sir.

Q. Did you express that opinion to anyone? A. I expect so, but I am not certain.

Mr. Corum: We object to Mr. Ellis on the ground that he has read accounts of the killing and statement of the evidence at the coroner's inquest and at the pre-

liminary hearing; that from reading such statements he has formed an opinion which he has now and which he has probably expressed to other parties.

The Court: Objection overruled. To which ruling of the court the defendant then and there duly excepted.

Mr. Journey, attorney for the State: Q. Mr. Ellis, on account of reading what you did in the newspapers, is your mind biased against the defendant in any way? A. No, sir.

Q. Do you know of any reason why you cannot try this case according to the law and the evidence if selected as a juror to try the case? A. No, I believe,—

By the Court: Q. Do you know anything about the case except what you have read in the newspapers? A. No, sir.

Q. And whatever impression you may have is what was made by the newspapers which you read? A. Yes, sir.

Q. If selected as a juror in this case could you give the defendant a fair and impartial trial under the evidence and the law. A. Yes, sir.

Mr. Corum: We renew the objection to juror W. H. Ellis.

The Court: Objection overruled. To which action and ruling of the court the defendant then and there excepted.

Mr. Mills, another of the forty, was asked and unswered the following questions:

Mr. Corum: Q. Mr. Mills, have you an opinion as to the defendant's guilt or innocence? A. Yes, sir, I have.

Q. Upon what do you base that opinion? A. From the reports which I read in the papers.

Q. Did the papers which you read contain a detailed statement of the testimony given at the coroner's inquest? A. Yes, sir, I think so.

Q. Do you recollect what papers you read? A.

The Advertiser, the Missouri Democrat and the Bunceton Eagle.

Q. After reading these papers you formed an opinion as to the defendant's guilt or innocence, and you have that opinion now. A. Yes, sir.

Q. Did you ever express that opinion to anyone? A. Yes, sir.

Mr. Corum: We object to Mr. Mills as a competent juror on the ground that he has read detailed statements of the testimony taken at the coroner's inquest and at the preliminary hearing, and has formed from reading those statements an opinion which he says he still has, and which opinion he has expressed.

The Court: Objection overruled. To which ruling and action of the court the defendant then and there duly excepted.

Mr. Journey, attorney for State: Q. Mr. Mills, did you talk to any of the witnesses in this case? A. No, sir.

Q. That opinion which you have formed is from reading the newspapers, isn't it? A. Yes, sir.

Q. Does that opinion cause your mind to be biased or prejudiced against the defendant? A. No, sir, I don't know that it does.

Q. If you were chosen as a member of this jury, could you go into the jury box and try the defendant and give him a fair and impartial trial, under the evidence and the instructions of the court? A. Yes, sir, I would try to do my duty.

The Court: Q. Could you do it, Mr. Mills? A. Yes, sir, I think so.

Q. You know nothing about the case except what you have read in the papers? A. Yes, sir.

Q. You say you expressed an opinion to whom? A. Just to the home folks.

Mr. Corum: We renew our objection to juror Terrill Mills.

State v. Darling.

The Court: Objection overruled. To which action and ruling of the court the defendant then and there excepted.

Mr. Corum: Q. Have you any opinion as to the defendant's guilt or innocence? A. Yes, sir.

Q. Upon what is that opinion based? A. Upon newspaper accounts.

Q. Did the papers that you read give a detailed statement of the evidence that was taken at the coroner's inquest? A. Yes, sir.

Q. And at the preliminary hearing? A. Yes, sir.

Q. And after having read these accounts you formed an opinion as to the defendant's guilt or innocence, and you have that opinion now? A. Well, yes, sir.

Q. Have you expressed it? A. No, I think not.

Mr. Corum: We object to Mr. Simmons as a competent juror in this case for the reason that he has formed an opinion based on newspaper accounts, giving a detailed statement of the evidence taken at the coroner's inquest and upon the preliminary hearing, and he says he has an opinion now.

The Court: Objection overruled. To which ruling of the court the defendant then and there duly excepted.

Mr. Journey: Q. The opinion you have is gathered from newspaper reports, is it not? A. Yes, sir.

Q. Would that opinion cause you to be biased or prejudiced against the defendant in any manner? A. No, sir, I think not; it was only formed from reading the newspapers.

Q. You have never talked with any of the witnesses in the case? A. No, sir.

Q. Could you go into the jury box and give the defendant a fair and impartial trial according to the evidence and the instructions of the court? A. Yes, sir, I think so.

The Court: Objection overruled. To which rul-

ing of the court the defendant then and there excepted.

It is conceded by defendant that, when the opinion of the juror is founded upon rumor or newspaper reports, or both rumor and newspaper reports, such opinion does not necessarily render him incompetent as a juror, and if it appears that the opinion of the juror is such that it will readily yield to the evidence, he is a competent juror. But defendant's contention in this case is that the opinions of the jurors with respect to the guilt or innocence of the defendant were not founded on newspaper reports, but upon the testimony which was taken at the coroner's inquest and at the preliminary hearing, as copied and printed in the newspapers. Each of these jurors stated upon his examination that he had formed an opinion as to the guilt or innocence of the defendant from reading newspaper reports, and, being asked if such papers contained the evidence that was taken at the coroner's inquest and the evidence that was taken at the preliminary hearing, answered, "I think so," and that he still entertained such opinion, which it would require evidence to remove.

They each stated, however, that if they were selected as jurors to try the case they could give the defendant a fair and impartial trial, under the evidence and instructions of the court. There was no evidence offered by the defendant tending to show that the evidence taken at the coroner's inquest, or at the preliminary hearing, and published in the papers read by the jurors contained an accurate statement of such evidence, nor were the newspapers offered in evidence, and the mere statement by the jurors that they thought they did were mere conclusions, expressions of opinion, and no evidence that said newspapers contained the evidence taken at the coroner's inquest or at the preliminary hearing. Section 2616, Revised Statutes 1899, provides that, "It shall be a good cause of challenge to a juror that he has formed or delivered an opinion on the issue, or any material fact to be tried; but if it ap-

pears that such opinion be founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror he may be sworn.''

It is clear from this statute that if the juror has formed or expressed an opinion as to the guilt or innocence of the defendant upon trial, he is disqualified as a juror, unless such opinion be ''founded on rumor or newspaper reports;'' then he is not disqualified provided his opinion is not such as to prejudice or bias his mind.

In the case of State v. Robinson, 117 Mo. 649, one of the jurors had read in local newspapers what ''purported to be'' the evidence taken at the coroner's inquest, and what ''purported to be'' the confessions made by the defendant to the sheriff, and had formed an opinion as to defendant's guilt or innocence therefrom, but was without bias or prejudice. The court said: ''But the trouble in the case at bar is that it is not made to appear that the reports read in the local papers were either a literal or a substantial report of the confession of the defendant as contained in the present record. This being the case, such printed statements must be regarded simply as 'rumors and newspaper reports,' and as the jurors said they were without bias or prejudice they were competent under the statute already quoted, and hence objections to them were not well taken.'' That case was followed in State v. Taylor, 134 Mo. 109.

In the case at bar it is not made to appear that the reports read in the newspapers were either a literal or substantial report of the evidence taken at the coroner's inquest or at the preliminary hearing of defendant. They must, therefore, be regarded as mere rumor and newspaper reports, and as the jurors answered that they could give the defendant an impartial trial under the evidence and instructions of the court, they were competent jurors under the statute quoted.

It is next claimed that the court erred in failing to

instruct on manslaughter in the fourth degree. This contention is predicated upon the testimony of the defendant and his brother Silas Darling which tended to show that when defendant, his brother Silas and Dorvil Burris left the house of Mr. Carroll, who was then absent therefrom, they did not return as they went but took another route in order to meet him upon his return, and in doing so they passed through the field where Jeffress was at work, that they did not know Jeffress was there, and when they reached the point where he was plowing he spoke to Silas Darling and Dorvil Burris as usual, but to defendant he applied opprobrious and insulting epithets, and said he ought to burst his head with the wrench which he then took from his pocket; that he immediately started towards the defendant, whereupon the defendant reached down and was in the act of picking up a rock, when deceased struck him on the arm with the wrench. That he, defendant, then struck deceased with the rock and they engaged in a close combat during which defendant struck deceased several blows with the rock which he had picked up at the point of the difficulty.

Manslaughter in the fourth degree under our statute is understood to be the intentional killing of a human being in a heat of passion on reasonable provocation, without malice and premeditation, and under circumstances which will not render the homicide justifiable or excusable. [State v. Hermann, 117 Mo. 629; State v. McKenzie, 177 Mo. 699; State v. Weakley, 178 Mo. 413; State v. Todd, 194 Mo. 377.] That the evidence of these witnesses tends to show that the homicide was committed in the heat of passion, on reasonable provocation and without malice, and if true reduced the grade of offense to manslaughter in the fourth degree, and entitled defendant to an instruction to that effect is, we think, clear.

A point is made upon the fifth instruction which defendant insists is erroneous in that it told the jury

that if they found the defendant guilty of murder in the second degree, they should assess his punishment at imprisonment in the penitentiary for any term of years not less than ten, when at the time of the trial defendant was under eighteen years of age, and, under section 7759, Revised Statutes 1899, the jury might have fixed his punishment at imprisonment in the penitentiary for a term of not less than ten years or might have committed him to the state reform school for boys for a term of not less than five years, if the jury had been so instructed. This statute does not change the mode of trial under such circumstances, nor is it found in the statute in regard to crime and punishments but under a separate and distinct chapter entitled, ''Reform School for Boys,'' and while it is inartistically drawn, it clearly means that a boy old enough to commit and who does commit a crime the punishment for which is death or imprisonment in the penitentiary for not less than ten years, is to be tried just as any other person committing such an offense, and after conviction if the court is satisfied that he is under eighteen years of age, he may, in the discretion of the court, ''be imprisoned in the penitentiary or committed to the state reform school for boys for a term not less than five years.'' The jury had nothing to do with the punishment otherwise than as instructed. If it had been the purpose of the lawmakers to make the law under consideration part of the statute with regard to crimes and punishments, it must be presumed that they would have in some way so provided, or made the law in question an amendment to the statute with respect to crimes and punishments. While not expressly decided the conclusion reached seems to find support in the case of State v. Townley, 147 Mo. 205.

In the absence of some evidence or circumstance tending to show that some one or more of the three defendants either saw or were in a position to see Mr. Carroll or that he saw some of them as he passed the

Darling house on his way to Blackwater on the day of the homicide, evidence tending to show that a person passing along that road would be in sight of a person at that house, for the distance of about a quarter of a mile, was improperly admitted. This testimony was evidently introduced as tending to show that the defendant who was at home on that day could have seen Mr. Carroll as he passed that road on his way to Blackwater and that the Darlings and Burris knew that he was not at home when they went to his house. Of course, if the State had shown that the defendant saw Carroll as he passed, or that he was in a position to have seen him, such evidence would have been admissible, but under the circumstances the jury were left to supply by imagination that which the State had failed to prove, that is, that some one or more of the joint indictees either saw, or were in a position to see Carroll, or that Carroll saw them as he passed along the road by the Darling home on his way.

We are unable to agree to the contention of defendant that there was no evidence tending to show a conspiracy between the Darlings and Burris to assault and beat the deceased. There was not only circumstantial evidence tending to show such an agreement, but there was positive evidence showing an agreement to assault the deceased, which fully justified the court in permitting evidence upon that theory to go to the jury. Besides, it is not necessary that a conspiracy be shown by direct and positive testimony, but it may be shown by facts and circumstances, and conduct of the parties, their joint action before and leading up to its execution. [Wharton's Criminal Law, sec. 1389; Wharton on Criminal Evidence, sec. 298; 2 Bishop's Criminal Prac., sec. 227.]

In Scott v. State, 38 Ala. 503, it is held that a conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different

persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object, especially if by the same means, may be satisfactory proof of a conspiracy.

So in the case of State v. Gooch, 105 Mo. l. c. 396, this court said:

"It is argued that no conspiracy between Nathan Gooch and appellant to assault Boyer is shown. There is, it is true, no evidence that they got together and entered into a formal agreement to make the assault. But men do not ordinarily make public proclamation of their criminal agreements and intentions. Almost without exception, these must be deduced from the circumstances in the case." [State v. Vallè, 164 Mo. 539.]

In discussing the same subject in Gibson v. State, 89 Ala. 121, the Supreme Court said:

"There was evidence tending to show a conspiracy on the part of the defendants to attack the deceased—circumstances from which the jury were authorized to infer a common design, at least, to assault and beat him. Each would, therefore, be criminally responsible for the acts of the other in prosecution of the design for which they combined. . . . . It was unnecessary to prove any express agreement on the part of the defendants to attack the deceased, or to kill him. An implied understanding, established by circumstantial evidence, would be sufficient. And the presence of one of the defendants, aiding, abetting and encouraging the other in making an attack on the deceased, might justify the jury in holding him criminally responsible for the homicide which resulted in the death of the party assailed."

But whether or not there did in fact exist a conspiracy between the indictees to assault Jeffress should have been submitted to the jury by proper instructions, and unless they believed from the evidence that such a conspiracy did exist, all statements made by either

Silas Darling or Dorvil Burris, not in defendant's presence, tending to show a mutual understanding between them to assault the deceased, should have been excluded from their consideration in passing upon the guilt or innocence of the defendant.

Nor was there error in permitting the State to prove by Mrs. Carroll that Dorvil Burris said, in speaking of the deceased, "He might work to-day, and he might not." While this statement was made in a conversation between the parties in the absence of the defendant, it was during a conversation had between them at the request of the defendant, and before the purpose of the conspiracy had been accomplished. It seems that the defendant and his brother, after talking to Mrs. Carroll and starting away, sent the witness Burris back to ask Mrs. Carroll if they had a hand. To this inquiry Mrs. Carroll replied that Sam Jeffress was working for her husband. Burris then remarked that "he might work to-day and he might not." The authorities all hold that everything done and said by the parties to a conspiracy during the time of the existence of the conspiracy, bearing upon its object and purpose, whether said in the presence of each other or not, is admissible in evidence. [4 Elliott on Evidence, sec. 1941; 2 Wigmore on Evidence, sec. 1079.] This remark of Burris tended to show that there was a conspiracy between the Darlings and him to assault Jeffress, which seems to have been conclusively shown by what occurred shortly thereafter. In this connection it may be said that any threats made by Silas Darling, if any, against the deceased before the conspiracy was formed, were inadmissible against the defendant.

It was for the court in the first place to say whether there was any evidence of a conspiracy, and for the jury to determine under proper instructions whether there was one and its purpose (State v. Walker, 98 Mo. 95), and upon a retrial of the case that

question should be submitted to the jury. [State v. Kennedy, 177 Mo. 98, and authorities cited.]

Defendant complains of the twelfth instruction, upon self-defense and murder in the first degree. The criticism of that part of it in regard to self-defense is exceedingly technical and without merit. As to the other part, with respect to murder in the first degree, it is only necessary to say that as defendant was only convicted of murder in the second degree, he is in no position to complain. [State v. Todd, 194 Mo. 377.]

A final contention is that the court erred in giving instruction numbered eleven, in respect to threats made by the deceased and not communicated to the defendant. The instruction seems to us to be in substantial accord with the repeated decisions of this court and the well-settled doctrine upon the subject.

After a careful consideration of all the questions presented on this appeal, our conclusion is that the judgment should be reversed and the cause remanded because of the failure of the court to instruct upon manslaughter in the fourth degree. It is so ordered.

All concur.