STATE of Missouri, Respondent,

v.

Harry W. SIEKERMANN, Appellant.

No. 49334.

Supreme Court of Missouri,

Division No. 1.

March 11, 1963.

Opinion Modified on Court's Own Motion
April 8, 1963.

Motion for Rehearing or to Transfer
to Court En Banc Denied
April 8, 1963.

Second Motion for Rehearing or to Transfer
to Court En Banc Denied May 13, 1963.

Garnet W. Taylor, St. Louis, for appellant.

Thomas E. Eagleton, Atty. Gen., J. Richard Roberts, Sp. Asst. Atty. Gen., Jefferson City, for respondent.

HOUSER, Commissioner.

Harry W. Sickermann was charged by information and by a jury found guilty of abortion under § 559.100, and one prior conviction of felony (abortion), and was sentenced to serve a term of 5 years in the custody of the department of corrections. He has appealed from the judgment and sentence.

Prosecutrix, Lee Jane Meyer, mother of four children, testified to the following: suspecting pregnancy since she had never gone so long without menstruation unless pregnant, she went to her local doctor in a small town in central Missouri. A test indicated positive. She was advised she was pregnant. Not desiring to have the child because it would have been "uncomfortable" and "might have to be taken by Caesarean," but not advised by any physician not to have the child for reasons of health, she went to St. Louis with the intention of effecting an abortion. On Saturday, May 14, 1960 she went to a laboratory on Lindell Boulevard, where she saw a Dr. James Austin. She told him she came to St. Louis "to find someone to perform an abortion." During the hour she spent with Dr. Austin he made two telephone calls in her presence, and told her the price of the operation she was seeking. She had $200 with her at that time. She made an appointment to return to Dr. Austin's office at 2 p. m. Monday. Over the weekend she arranged to get more money. On Monday afternoon, May 16 she returned to the doctor's office. He told her to be at the Howard Johnson restaurant in Clayton at 7 o'clock that evening and to wait there until someone drove up in a white Cadillac. She arrived at the restaurant at approximately 6:45 that evening, had a cup of coffee, and when a white Cadillac drove up she went out and opened the door. The driver, a man, asked her if she was Lee Meyer. She said "Yes" and he said "Get in." After she entered the car he drove to another Howard Johnson's restaurant, on South Lindbergh Drive, arriving there ap-proximately half an hour later. During the drive she had a conversation with the man about the purpose of her visit to St. Louis. He said that "there wasn't anything to it, remarked about different clients that he had from all over the country," and "mentioned one clergyman's wife that had come to see him." He said his nurse was the one whom she was to meet.

When they arrived at the other Howard Johnson restaurant they pulled in, and waited a few moments. The car that was expected was not there so they drove around a while longer, then returned to the restaurant, drove onto the lot and parked. Soon a blue Cadillac drove up and parked some distance from the white Cadillac. The lone occupant of the blue Cadillac was a woman. The man got out of the white Cadillac and went over to the blue Cadillac. He talked to the woman in the blue Cadillac for about 5 minutes. Then he came back to the white Cadillac and got the Meyer woman, who went over to the blue Cadillac. The Meyer woman was introduced to the driver of the blue Cadillac as "Vi." The man returned to his white Cadillac and drove away, in a northerly direction. Vi and the Meyer woman drove south in the blue Cadillac to a large home located at 1521 South Lindbergh Drive in St. Louis County.

The Meyer woman was taken upstairs to a bedroom, where she undressed and went to bed. Vi came in, mentioned the money, and the Meyer woman turned over $1,000 in cash to Vi. Around midnight Vi and another woman, a short heavy-set woman, came into the room. The other woman performed the abortion. She "inserted something in [her] womb, and they said * * * 'Take a sleeping pill now and go on to sleep.'" She was awakened the next morning when served breakfast. She had cramps and stayed in bed. She began to menstruate that day. Late in the morning she passed a clot. After lunch, late in the afternoon, she passed "another substance, the afterbirth is what they said it was." She remained in the room. About eight

o'clock that evening (May 17) police arrived and arrested Viola Waelter and Mary Goolsby. About an hour later the police took the Meyer woman to county hospital. At the hospital she was placed in the hands of a physician who performed a pelvic examination. His diagnosis: an incomplete abortion. Taken to the police station, she saw the man who had driven her around and introduced her to Vi the previous evening and was told by the police that his name was Harry W. Siekermann. She had not seen him since she got in Vi's car. He was not present and she had not seen him at 1521 South Lindbergh during the 24 hours she spent there. At no time did the Meyer woman hear Vi say anything about a Mr. Siekermann, nor had she heard Dr. Austin mention his name. Police had that house under surveillance for a month prior to May 17. At no time during that period was defendant seen at or near that place.

On May 17 between 7 and 8 p. m. detectives had observed defendant driving a white Cadillac, license No. Z20563, with a woman later identified as the Meyer woman. They saw the Cadillac pull into the parking lot of the Howard Johnson restaurant on South Lindbergh; observed the blue Cadillac park nearby; saw defendant get into the blue Cadillac; saw defendant leave in one direction and followed the blue Cadillac to 1521 South Lindbergh, where it parked; saw the two women enter the house.

Defendant put on no testimony.

These instructions were given:

### Instruction No. 1

"The Court instructs the Jury that if you find and believe from the evidence in this case that in the County of St. Louis, State of Missouri, on or about the 17th day of May, 1960, one Lee Jane Meyer was a female person then and there in the state of good health, and if you further find and believe from the evidence, beyond a reasonable doubt, that on or about said date, the defendant in the County of St. Louis, State of Missouri, acting either alone or together with another or others, did wilfully, unlawfully and feloniously make an assault upon the said Lee Jane Meyer, and did then and there wilfully, unlawfully and feloniously use and employ in and upon the body and womb of the said Lee Jane Meyer a certain instrument or instruments and thrust and force certain rubber tubing or other instruments into the private parts and womb of the said Lee Jane Meyer, with the felonious intent then and there to promote and to produce an abortion upon and to the person of the said Lee Jane Meyer, and if you further find and believe from the evidence, beyond a reasonable doubt, that such abortion was not then and there necessary to preserve life of the said Lee Jane Meyer or that of an unborn child, and, if you find that the use of such rubber tubing or other instruments to produce an abortion was not then and there advised by a duly licensed physician to be necessary for the purpose of preserving the life of the said Lee Jane Meyer or an unborn child, then you will find the defendant guilty of Abortion.

"Feloniously, as used in this Instruction, means wickedly and against the admonition of the law, that is, unlawfully."

### Instruction No. 2

"The Court instructs you that all persons are equally guilty who act together with a common intent in the commission of a crime, and a crime committed by two or more persons acting jointly, is the act of all and each one so acting. And to make a person equally guilty with others who act together with a common intent in the commission of a crime it is not necessary that all the persons so acting together with a common intent in the commission of a crime be personally present at the commission thereof.

"If a person, though not actually present when a crime is committed, before the

commission thereof aids, abets, assists or encourages the commission of same, then such person is equally guilty with the person or persons who actually commit such crime."

Appellant's principal point is that the evidence was insufficient to sustain a judgment of conviction. Appellant points to the words "if acting alone" in Instruction 1, and argues that it is admitted that appellant was not present when the operation was performed. Appellant points to the words "if acting together with another or others," and contends that there is no evidence of a conspiracy.

■ All persons who act together with a common intent and purpose in the commission of a crime are equally guilty even though they are not personally present at the commission of the offense. State v. Slade, Mo.Sup., 338 S.W.2d 802, and cases cited, 1. c. 806. It was not necessary that the state prove that appellant personally participated in the actual operation which induced the miscarriage.

■ "[T]he proof of a 'common criminal purpose, acted upon by the parties,' is sufficient to show a criminal conspiracy." State v. Johnson, Mo.Sup., 286 S.W.2d 787, 792. Acting together with a common intent in the commission of a crime is tantamount to a conspiracy. State v. Miller, Mo. Sup., 29 S.W.2d 54, 55 [1].

■ There is ample evidence of common intent or purpose, or conspiracy, on the part of appellant and the other defendants to commit the crime of abortion, as hereinafter fully developed. In this connection see State v. Ellrich, 10 N.J. 146, 89 A.2d 685, 688.

■ Appellant makes the closely related point that the instructions failed to submit the issue of conspiracy, and failed to require the finding of a conspiracy before the statements, acts and conduct of others not in the presence of appellant could be used as probative evidence against him. The argument is that appellant was not present, actually or constructively, at the time the crime was committed, and therefore prosecutrix' testimony as to the statements, acts and conduct of the others and the inferences to be drawn therefrom before and after she was in the presence of appellant (i. e., in the doctor's office and while in Vi's charge) could not be considered in evidence against appellant, unless and until there was proof of a conspiracy between appellant and the others to criminally abort prosecutrix; that the court should have first determined whether there was evidence of conspiracy, and the jury should have been instructed first to find the existence of such conspiracy before the statements, acts and conduct of the co-conspirators outside appellant's presence could be considered against him.

Appellant was charged jointly with Viola Waechter and Mary Goolsby with abortion. He took a severance. When prosecutrix' testimony as to statements, acts and conduct of the co-conspirators was offered appellant made no objection to its admission. At the close of the evidence appellant made no request for an instruction requiring the finding of the existence of a conspiracy before the jury could consider the statements and acts of the co-conspirators, outside appellant's presence, against him. The case was submitted on the theory of the joint action of appellant and the others, acting with a common intent in the commission of the crime.

■ On this record there is no error. The instructions submitted the issue of conspiracy. Instruction 1 required the jury to find that appellant "acting * * * together with another or others" did the acts hypothesized. Instruction 1, read in conjunction with Instruction 2, required the jury to find as a necessary prerequisite to a verdict of guilty a common intent and purpose (or concert of action) between appellant and those who actually inserted the

instruments of abortion into the body of prosecutrix. State v. Washington, Mo.Sup., 364 S.W.2d 572, 576 [9].

■ While the instructions did not require the jury to find the existence of a conspiracy from evidence other than the acts and statements of the co-conspirators before it could consider such acts and statements, not made in the presence of appellant, as evidence against him, this was not error in this case. Instructions of this nature are cautionary, State v. Baldwin, Mo.Sup., 358 S.W.2d 18, 29, and cautionary instructions are not required to be given as a part of the law of the case in the absence of a request therefor, but are to be given or not in the discretion of the court. State v. Hinojosa, Mo.Sup., 242 S.W.2d 1, 11 [23].

Cases cited by appellant, State v. Kennedy, 177 Mo. 98, 75 S.W. 979, and State v. Darling, 199 Mo. 168, 97 S.W. 592, do not require a reversal of the judgment on the instant record. In Kennedy, tried on the theory that there was a conspiracy to commit murder, counsel for defendant objected to the statements of the co-conspirators when offered in evidence, on the ground that no conspiracy had been proved. In ruling the objection the court of its own volition announced from the bench that the question whether a conspiracy is proven or not is a question of fact the jury has to decide. Yet the court ignored this theory of the case in the instructions, which said nothing about conspiracy, and thus "usurped the province of the jury in that regard." In this situation it was held unnecessary for defendant to ask the court to instruct on the question of conspiracy, or call attention to its failure to do so, "because it cannot, under such circumstances, be presumed that it was an oversight that it did not do so"; that *under such circumstances* it was error not to so instruct the jury. In Darling, the judgment of conviction was reversed not for failure to so instruct, but for failure to give an instruction on manslaughter in the fourth degree. The question of conspiracy was not submitted to the jury, and in passing the court observed that whether a conspiracy in fact existed should have been submitted to the jury by proper instructions, "and unless they believe from the evidence that such a conspiracy did exist all statements made by either or both [co-conspirators] not in defendant's presence tending to show a mutual understanding between them to assault the deceased should have been excluded from their consideration in passing upon the guilt or innocence of the defendant." Darling does not, however, brand the failure to so instruct as reversible error.

Appellant claims that prosecutrix' testimony as to the acts, conversation and conduct of appellant while in her presence, together with the reasonable inferences to be drawn therefrom, is insufficient to sustain a conviction; that her testimony shows no intent on appellant's part to promote an abortion and the use of an instrument with that intent; that the gravamen of the charge is the intent with which the instruments are used.

Appellant's acts, conduct and conversation during and at the conclusion of prosecutrix' ride in the white Cadillac, considered in connection with the evidence of what transpired before and after that interval, forge a strong link in the chain of guilt which stretches from the office in which prosecutrix informed the doctor of her purpose in coming to St. Louis, to the room in the house of abortion on South Lindbergh Drive where "the other woman," in the presence of Vi, performed the criminal act. Obviously appellant had been in contact with the doctor to whom prosecutrix resorted seeking an abortion; knew the purpose of picking up the Meyer woman; knew whom to expect and when and where to make contact with her; called her by name and invited her into his automobile; demonstrated his complicity by referring to the scope of his "clientele"; reassured his victim in a manner calculated

to assuage any fear of the operation, and transported, delivered and introduced her into the hands of his "nurse," who turned out to be the operator of a house of abortion. What appellant did and said, taken in connection with the other evidence in the case, is strong circumstantial evidence that he entertained a criminal intent to accomplish an abortion, and that he aided, abetted, assisted and encouraged the principals in the first degree in the commission of the crime. It was not necessary to show that appellant personally introduced the instrumentality into the body of the prosecutrix.

■ Appellant complains that the jury was given no definition of the word "intent" as thus used in Instruction No. 1: " * * * with the felonious intent then and there to promote and to produce an abortion * * *." The word "intent" is a word in common use. Words that are in common use need not be defined. State v. Gridley, Mo.Sup., 353 S.W.2d 705, 707. The descriptive word "felonious," which was defined as meaning "wickedly and against the admonition of the law, that is, unlawfully," modified the word "intent." The instruction was sufficient for the jury to understand what was meant by the word "intent."

■ Appellant further objects to the failure of the court, on request, to define the terms "aid" and "abet," claiming they are legal, not common, terms and therefore require explanation; that "aid" does not imply guilty knowledge or felonious intent, whereas "abet" includes knowledge of the wrongful purpose and implies presence, either actual or constructive; that failure to define these terms resulted in misdirection by not informing the jury that " 'a mere knowledge that a crime is about to be committed, or a mental approbation of what is done while the will contributes nothing to the doing, will not create guilt.' " There was no error in failing to define "aid" and "abet." In State v. Present, Mo.

Sup., 344 S.W.2d 9, the use of words less favorable to the defendant than these ("did in any way help, aid, and assist") was upheld as against the contention that the court should have specified *what* aiding and helping would have been sufficient and that the "indiscriminate" term employed left the jury to speculate and supply its own ideas as to what constituted aiding. Failure to define "abet" did not eliminate the necessity of finding knowledge on appellant's part of the wrongful purpose because the jury, before it could convict, was required by the instructions to find that appellant, acting jointly together with others in a common intent to commit a crime, wilfully, feloniously, wickedly and unlawfully, made the assault with felonious intent. A requirement of these findings necessarily involved a finding of knowledge of wrongful purpose. Appellant was not deprived of the defense that mere knowledge that a crime is about to be committed or mental approval without overt act will not create guilt. He could have, but did not, request such an instruction. See State v. Present, supra, 344 S.W.2d, 1. c. 12 [4] for an application of this rule in connection with a similar contention.

■ Appellant complains that in the course of the testimony of two detectives it was developed that they *had seen* Harry Siekermann on many occasions, numerous occasions, ten or twelve occasions, prior to the time they observed him on May 16, 1960. They had testified that they observed Siekermann drive his white Cadillac into the parking area of the restaurant on South Lindbergh Drive and watched him transfer the Meyer woman from his car to the blue Cadillac. The objection is that testimony of police officers that they *had seen him on numerous previous occasions* caused the jury to infer that the officers had had previous dealings with defendant in their official capacity; that he had a police record, and thus the state improperly placed the defendant's character in issue. Such inferences would be unwar-

ranted from the mere fact the detectives had seen appellant often. This assignment is quite similar to that made in State v. Pitchford, Mo.Sup., 324 S.W.2d.684, 688, where two police officers testified that they had *known* defendant prior to the time of arrest. What we said there is applicable here: "It is well known that most police officers have a wide acquaintance among the citizenry in general and the fact that a person is known to a police officer does not necessarily convey the impression that he has a criminal record." The evidence was clearly admissible on the question of the identification of appellant.

■ Appellant suggests error in admitting in evidence Exhibits 1–26 and having the jury walk by and inspect Exhibits 7–26, on the ground that they were highly prejudicial to appellant and induced the jury to believe he was identified with them, although there was no connection between these articles and appellant. Exhibits 1–6 were photographs of the house at 1521 South Lindbergh Drive. Since defendant's counsel stated at the trial that he had no objection to the admission of Exhibits 1–6 in evidence, the question of their admissibility has not been preserved. Exhibits 7–26 were surgical instruments, including forceps, surgical gauze, face mask, medical disposable panty pads, rubber douche ensemble, tablets and pills, stainless steel metal syringes with liquid, hot water bottle, rubber sheets, white linen cloths and a plastic squeeze bottle. These articles were found by the officers in the house at 1521 South Lindbergh Drive on the evening of May 16, after they arrested Vi and the other woman. Some of the surgical instruments were of the type used in cases of incomplete abortions. Some of the drugs were the type used to make the womb contract, or to control bleeding in case of miscarriages, or to suppress the production of milk in pregnant women. Exhibits 7–26 would all be useful and valuable in the performance of abortions.

■ Demonstrative evidence which shows motive, malice, intent, knowledge or preparation for the commission of a crime, or which tends to establish the crime charged, connect the accused with the offense, explain the intention of the accused, give the jury a more accurate impression of the facts, or throw any relevant light upon any material matter, is admissible in evidence, State v. Evans, Mo.Sup., 237 S.W. 2d 149, 151, if it meets the tests of relevancy, materiality, probative force and reasons of policy in the administration of justice, State v. Miller, 364 Mo. 320, 261 S.W.2d 103, and authorities cited, 1. c. 107 [4], and if the physical objects sought to be submitted to the senses of the jury are identified as connected with the defense or with the defendant. State v. Wynne, 353 Mo. 276, 182 S.W.2d 294.

■ Exhibits 7–26 were admissible in evidence, and there was no error in allowing the jury to view them, under these rules and tests. In order to establish appellant's guilt as an accessory before the fact on the theory of joint action of defendants acting together with a common intent in the commission of a crime the burden was on the state to prove that the principals committed the crime. 22 C.J.S. Criminal Law, § 90, p. 269. Apparatus, instruments, supplies and paraphernalia suitable for the performance of abortions, of the type and kind which could have been employed in the operation on prosecutrix, found in the possession of the persons identified by prosecutrix as the principal abortionists, at the residence where and within 24 hours after the time the operation on prosecutrix was performed, constitute evidence that the principals were equipped and prepared to perform procedures such as that described, People v. Vosburg, 123 Cal.App.2d 535, 266 P.2d 927, and evidence an unlawful intent and criminal purpose on the part of the principals. People v. Bowlby, 135 Cal.App.2d 519, 287 P.2d 547 [6], 53 A.L.R.2d 1147.

Appellant objects that there is no proof that he was ever seen at that address or that he had ever seen these exhibits. This is immaterial. If appellant sent prosecutrix to a place fully stocked with the apparatus, supplies and paraphernalia necessary for the commission of the crime of abortion, and staffed with personnel ready and waiting to employ these instrumentalities on her, with full knowledge on the part of appellant of the purpose of the trip and felonious intent to consummate the deed, it would make no difference that appellant was not physically present on the premises before or during the doing of the criminal act, or that he had never seen the exhibits.

■ Finally, appellant claims error in not declaring a mistrial when the prosecuting attorney commented on the failure of defendant to testify. Counsel for the state, Mr. McSweeney, said:

"Now, let us stop right there because that is about the extent of the evidence. The State's evidence stands uncontradicted in this case. When the State had concluded its case, the defense was free to offer any evidence it chose.

"Mr. Shaw: Object to that and ask the jury be discharged and a mistrial declared, your Honor.

"The Court: Overruled; denied.

"Mr. McSweeney: The defense was free to offer—

"Mr. Shaw: Your Honor—

"Mr. McSweeney: —any evidence it chose.

"Mr. Shaw: Same objection.

"The Court: Same ruling.

"Mr. McSweeney: But none was forthcoming.

"Mr. Shaw: Same objection. Ask the jury be discharged and a mistrial declared.

"The Court: Same ruling.

"Mr. McSweeney: You can view this case as the scales of justice as far as the evidence is concerned, the State's on one side, nothing on the side of the defense.

"Mr. Shaw: Same objection. Ask the jury be discharged and a mistrial declared for an improper comment on the failure of the defendant to testify.

"The Court: Same ruling, both of them."

Appellant urges that this called the attention of the jury to the fact that defendant did not testify, and that there was a demonstration on the record before the jury, but there was no affirmative action by the court to stop, correct or withdraw any of the statements.

Defendant did not testify, and did not introduce any evidence of any kind.

We find no error in the action of the court, or in the argument of the prosecutor. His comments relate to the weight of the evidence, and not to the failure of accused to testify. The decided cases uphold arguments of this kind as against this objection. The following arguments have been held not to constitute a comment on the failure of defendant to testify: "[A]nd what's on his side of the scale—empty," State v. Spradlin, 363 Mo. 940, 254 S.W.2d 660, 662 [5]; "* * * you can view the evidence in this case as you view the scales of justice themselves. On one side is the State's evidence, not contradicted. And what is on the defense side? It is empty," State v. Hite, Mo.Sup., 298 S.W.2d 411, 413 [3]; "When the State closed the evidence, what did the defense offer? They offered no evidence at all," State v. Hayzlett, Mo.Sup., 265 S.W.2d 321, 323, 324 [3–6]; "Now, there hasn't been one bit of evidence here to refute what any of these people said," State v. Murray, Mo.Sup., 280 S.W.2d 809, 811 [4]; "The defendant knows about things you

don't know about. * * * He had as full an opportunity as we did to produce evidence," State v. Romprey, Mo.Sup. (en banc), 339 S.W.2d 746, 755 [25].

The judgment is affirmed.

COIL, C., not participating.

HOLMAN, C., concurs.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges of the Division concur and HUNTER, Special Judge, concurs.