**STATE of Missouri,
Plaintiff-Respondent,**

v.

**James WASHINGTON, Jr.,
Defendant-Appellant.**

**No. 48369.**

Missouri Court of Appeals,
Eastern District,
Division Two.

March 18, 1986.

Daniel P. Reardon, Jr., St. Louis, for defendant-appellant.

John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

REINHARD, Judge.

Defendant was convicted by a jury of capital murder, § 565.001, RSMo 1978. Defendant was sentenced to life imprisonment without eligibility for probation or parole for fifty years, pursuant to the jury's recommendation. The judgment is affirmed.

Defendant contends on appeal that the court erred in: (1) denying defendant's mo-

tion to suppress the identification testimony of Maurice Hudson and Jeff Dickens; (2) admitting into evidence the hearsay testimony of witness Beverly Stricker concerning a statement made by Carol Reason which took place out of the presence and hearing of the defendant; and (3) admitting the testimony of Chippewa Bank authorities concerning the banking activities of Carol Reason and the Little Bits Bar.

The sufficiency of the evidence is not contested, but the following statement of facts adduced at trial is necessary for the disposition of the issues raised on appeal. Evidence presented by the state revealed that Leroy Reason was murdered on April 24, 1982. Approximately one month before his death, Leroy suggested to his wife, Carol Reason, that they obtain a divorce, which he filed for on April 22, 1982. In the wake of a dispute over the divorce and property settlement proposed by Leroy, Carol informed her sister that if he intended to "play dirty" she would "play dirty too." On April 24, 1982, he called Carol's sister's husband to tell him that Carol was throwing knives at him.

Later that day, between approximately 6:00 and 6:30 p.m., while it was still daylight, Maurice Hudson, who lived two houses down from the Reasons, saw Carol drive her grey Lincoln Continental past her house. Hudson, who was eighteen at trial, and knew Carol and her car by sight, noticed that she did not park in front of her house, but instead drove to a corner up the street from her house to park. She then walked down to her house. Hudson went outside where he saw a large, black man walk by, heading in the direction of the Reason's house. Hudson noticed the man, whom he had not seen before in the neighborhood, when he was about three houses away. He later identified him as defendant. As he passed within approximately ten yards of Hudson, they greeted each other. Defendant continued towards the corner on which Carol's car was parked and turned right.

A short time later, Hudson saw Leroy Reason pull into his driveway and enter his house. Carol then drove off. At around this time a friend of Hudson's, Jeff Dickens, who was eighteen at trial, joined him on the front porch and the two shared a marijuana cigarette. Approximately five minutes after Carol drove off, defendant again appeared, walking toward the Reason house. He spoke to the boys as he passed them, asking if they were smoking marijuana. He then walked up to the Reason house and knocked on the tapper, after which the boys heard the sounds of a "commotion," as if someone were being thrown against a wall, and popping noises. Defendant then walked to the grey Lincoln Continental, which was again parked up the street, and entered on the passenger side. Hudson saw Carol when defendant opened the car door. The car immediately drove away. The boys stayed in the yard for about 45 minutes to an hour, after which Hudson observed Carol pull into her driveway. She entered the house, discovered her husband's body, and began screaming. Another neighbor entered the house shortly thereafter and saw Carol beside Leroy's body, yelling that he had been shot. However, the paramedic who arrived within ten to fifteen minutes of this could not immediately determine that Reason had been shot. He testified that he did not notice the bullet wound to the body until he removed Reason's shirt, because the shirt pattern kept him from noticing the bullet hole. He also stated that the bullet wound to the neck appeared to be only a spot of blood until he spread apart the skin. Leroy Reason was declared dead of gunshot wounds.

Within a few days of the incident, the boys were questioned by officers investigating the murder. At the motion to suppress identification hearing, Hudson stated that he described the man he had seen to the police as being a large, black male, about six foot five inches tall, well over 200 pounds, who was wearing a red jacket and blue jeans and had a long afro hairstyle with a curl in it that was combed back. Dickens stated at the hearing that he gave police a description of a large black male who looked like a football player, with a

red jacket, blue jeans and long hair. Both boys repeated these descriptions of the man's appearance at trial. Upon being informed of this description, Detective Jerry Dodson, a police officer who had been involved in an extra-marital affair with Carol Reason for a number of years, indicated that he had seen an individual matching the description talking to her the night before the shooting. This occurred at the tavern she owned, the Little Bits Bar. A photo of defendant was located, and on May 5, 1982, Hudson and Dickens were separately shown a series of five photographs. Each boy identified defendant's photo as the man they observed at the time of the incident. In July of 1983, the boys independently viewed a line-up, and each identified defendant. Maurice Hudson viewed the line-up twice, identifying defendant during his second viewing. They also positively identified defendant in court. Hudson and Dickens further testified that they had seen defendant's photograph only once since they were first asked to identify him, and that was at a trial directly connected with the killing.

Another witness, Laura Greenwood, who had known Carol for a number of years, had been in her home, and knew her car, also saw her on the evening of April 24th. At around 7:00 or 7:15 p.m., she and a girl were driving down the street when she noticed Carol's car parked down the street from the Reason house. Carol was in the car, looking towards her house. The girls drove around for approximately a half hour, after which they joined Hudson and Dickens in Hudson's yard. Greenwood was still at Hudson's when Carol returned. She saw Carol pull into her driveway behind Leroy's parked car and enter the house, after which she heard screaming.

Jerry Dodson and Beverly Stricker, a friend of Carol's, also separately identified defendant at a line-up and in court as the man they saw talking to Carol Reason at her tavern, the night before the shooting. Beverly Stricker testified that Carol Reason introduced the man as "Jim". She stated that Carol left the bar that night with defendant and his date, a black wom-

an. She also testified that three weeks after the shooting, Carol Reason visited her at her home, and told her that if the police or anyone else asked about the time she took the black couple home, she should tell them that Carol was getting something out of her car for them.

Other evidence revealed that Carol Reason had called a former co-worker of defendant ten days prior to the shooting, and had asked to speak to defendant, who was not there. She then asked how to get in touch with him. The evidence also showed that Carol's bar had cashed a number of checks for defendant in 1976, when he was employed next door to her bar.

In addition, the state presented evidence from Carol's bank, showing a number of transactions around the time of the incident. The bank records showed that in March and April Carol regularly withdrew large amounts of cash from an account set up in the name of the Little Bits Bar. The records also showed that in the month prior to Leroy's death, Carol closed an account which she had in both their names, and deposited the money in a new account set up with her daughter. On May 3rd, she withdrew $1,600 in cash from the new account.

Carol Reason testified for the defense, stating that she did not know defendant, and that he was not in her bar the night before the shooting. She explained that on the night prior to the shooting, although she left the bar at the same time as a black couple, she did not leave with them, but instead walked her daughter to her car, an assertion to which her daughter also testified. She stated that her bar regularly cashed payroll checks for patrons, so that it was necessary for her to have large sums of cash on hand, and to frequently make cash withdrawals. She maintained that she parked up the street from her house on the day of the shooting due to car trouble. She also averred that Beverly Stricker's testimony, that Carol instructed her not to tell the police that she took the black couple home from her bar, was a complete

fabrication. She denied visiting Ms. Stricker, and denied making the remark.

Defendant presented an alibi defense, testifying in his own behalf. Two witnesses stated that he was with them around the time of the incident. Defendant denied knowing Carol Reason and contracting with her for the murder of her husband. He testified that in 1977 he had been convicted of burglary in Illinois. He stated that in April of 1982 he was on parole from the correctional institution.

Defendant contends that the court erred in admitting the identification testimony of Maurice Hudson and Jeff Dickens, in that the circumstances of pretrial identification were unduly suggestive and gave rise to a substantial likelihood of misidentification. The boys were separately shown a series of five photographs within two weeks of the incident. Each boy positively identified defendant as the man they saw leaving the Reason home around the time of the incident. Over a year later, after defendant had been located in Illinois and returned to Missouri, a line-up was held, at which both boys separately identified defendant. The boys testified as to these extra-judicial identifications, and also identified defendant in court.

The principles relevant to the admissibility of identification testimony were briefly stated by our court in *State v. Toney*, 680 S.W.2d 268, 275–276 (Mo.App.1984) in which we stated:

> Thus, in considering the out-of-court identifications, a two-step analysis is required. *State v. Higgins*, 592 S.W.2d 151, 159 (Mo.1979). First, the police procedures are to be considered to determine if they are impermissibly suggestive. Second, if they are found to be impermissibly suggestive, then the inquiry turns to the reliability of the in-court identification. In determining reliability, the court looks at the "totality of the circumstances" including: (1) The opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description

of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *State v. Sanders*, 621 S.W.2d 386, 389[1, 2] (Mo.App.1981).

Applying these principles, we first note that the procedures employed by police in obtaining the identification testimony were in no way impermissibly suggestive. Each photograph, in the spread of five, was of a black male. Although defendant's photograph was a mug shot, it was not impermissibly suggestive of defendant's involvement in the crime, in that all information as to name, height and weight was taped over prior to viewing. *See Toney*, 680 S.W.2d at 276, 277. The boys viewed the photos separately, and the two officers made no improper remarks or motions indicating that defendant's photo should be picked. The lineup was also properly conducted. However, defendant contends that the procedure was suggestive because the boys remembered only defendant's picture at the time they viewed the line-up. We note that courts have found in other cases that there is no improper suggestion in this procedure. *State v. Robinson*, 641 S.W.2d 423, 427 (Mo. banc 1982).

However, even if such procedures were impermissibly suggestive, the testimony displays reliability under the totality of the circumstances test. The boys had ample opportunity to view the defendant during daylight hours. Both boys saw him at least twice, and he spoke to them as he passed within a short distance of where they were standing. Although the witnesses' degree of attention may have been affected by smoking marijuana, defendant was particularly noticeable because of his exceptionally large size. In addition, the "commotion" at the Reason's house, following defendant's appearance at the door, undoubtedly drew their attention to him. The boys accurately described defendant to the police, and showed a high level of certainty in picking defendant out of both the photographic and the live lineups. Al-

though sixteen months elapsed between the crime and the second confrontation, courts have sustained as reliable identifications occurring after similar lengths of time. *See State v. Story,* 646 S.W.2d 68, 71 (Mo. banc 1983). The court did not err in admitting the identification testimony.

Defendants next two points refer to evidence involving Carol Reason. Defendant asserts that the court erred in admitting, over objection, the hearsay statement of Beverly Stricker that Carol Reason said to her, approximately three weeks after the shooting, "Remember when I took the black couple home? If anybody asks you if, [sic] the police or anybody asks you, to tell them that I had something in the trunk of my car for them and I was getting that for them." Counsel objected to the testimony as hearsay at trial, but the point was not mentioned in defendant's motion for new trial.

■■■ In *State v. Lee,* 522 S.W.2d 63 (Mo.App.1975) the defendant objected to testimony regarding out-of-court statements made by an alleged co-conspirator outside of his presence, claiming that they were inadmissible as hearsay because no conspiracy had been shown at the time the statements were made. Judge Higgins, speaking for the court, stated:

> Irrespective of defendant's objection to admission of the foregoing, there is no allegation of error in his motion for new trial which goes to this charge. Accordingly, allegation of error (III) has not been preserved for review, ...: and it is not urged as plain error under Rule 27.-20(c), supra. (citations omitted).

*Id.* at 65. Similarly, defendant has failed to preserve his point for review and we find no manifest injustice. In addition, however, our examination of this point convinces us that the court committed no error. The statements of Carol Reason were admissible as a declaration of a co-conspira-

tor made in furtherance of the objects of the conspiracy. While recognizing that statements of a co-conspirator are admissible, defendant argues that the State failed to make a prima facie case of conspiracy.[1] We disagree. A conspiracy may be established by circumstantial evidence. *State v. Danforth,* 654 S.W.2d 912, 920 (Mo.App. 1983); *State v. Casto,* 231 Mo. 398, 132 S.W. 1115, 1118 (1910). This includes the agreement, which the courts recognize can rarely be proved by direct evidence. *State v. Darling,* 199 Mo. 168, 97 S.W. 592, 601 (1906). In concluding that a prima facie case of conspiracy was established, we consider the following evidence and the reasonable inferences therefrom.

The evidence revealed that the Reasons were embroiled in a bitter dispute over a proposed divorce and property settlement, in reference to which Carol told her sister that she was willing to "play dirty." On the day of Leroy's murder, the situation had deteriorated to the point that he called his brother-in-law to tell him that Carol was throwing knives at him.

The testimony showed that Carol had called a former co-worker of defendant, approximately ten days prior to the shooting, in order to contact him. Witnesses identified defendant as the man she was talking to in her tavern on the night before the shooting. In addition, she introduced defendant to Beverly Stricker as "Jim," which is defendant's name, and was seen leaving the bar with him that night. Carol Reason made substantial withdrawals of cash just prior to and after the date of the shooting. Furthermore, when arrested defendant gave the alias Raymond Blackston to the police.

She was also seen parked, not in front of her house, but up the street on the corner, shortly before defendant was observed walking past her house. She drove off after her husband arrived home, and within five minutes defendant again appeared.

---

1. Defendant also contends that it was necessary to submit the issue of conspiracy to the jury. We note that for purposes of testing the admissibility of a co-conspirator's declarations, a conspiracy need not be charged in the indictment or information. *State v. Fuhr,* 660 S.W.2d 443, 448 (Mo.App.1983). Defendant relies on *State v. Kennedy,* 177 Mo. 98, 75 S.W. 979 (1903) for his contention, but overlooks *State v. Siekermann,* 367 S.W.2d 643 (Mo.1963).

At this time defendant knocked on the tapper and a "commotion" and popping sounds were heard coming from the Reason home. Immediately after this incident defendant walked up to her car, again parked on the corner, entered the passenger side, and the car drove off. She was seen in the car with him. Around forty-five minutes later she pulled into her driveway, entered her house, and began screaming. She was seen near Leroy's body yelling that he had been shot, although the paramedic testified that it was not initially obvious that Reason was the victim of a shooting.

We believe that the preponderance of the independent evidence shows that defendant and declarant were members of a conspiracy and further, that Carol Reason's declaration was made during the course and in furtherance of the conspiracy. Although the challenged out-of-court statement by Carol was made after the shooting, it was clearly an attempt to conceal from the police and others the fact that she took defendant home on the night before the shooting, and was, in other words, an attempt to conceal the conspiracy.

> If a conspiracy continues for any purpose, such as the concealing of the crime or taking measures to prevent or defeat prosecution, the admissions of one co-conspirator are admissible against the other, even if made after the completion of the crime which had been the objective of the conspiring. (citation omitted).

*State v. Smith,* 631 S.W.2d 353, 360 (Mo. App.1982); *noted in, State v. Yingst,* 651 S.W.2d 641, 645 (Mo.App.1983). We conclude that a prima facie case of conspiracy was established. Therefore, the challenged testimony was admissible against defendant.

 In defendant's final point on appeal, he asserts that the trial court erred in admitting the testimony of bank authorities concerning the banking activities of Carol Reason, because the testimony was prejudicial and in no way connected to defendant. Defendant's point is without merit. Whether evidence is relevant is an issue vested within the sound discretion of the

trial court. *State v. Laws,* 668 S.W.2d 234, 240 (Mo.App.1984). As conceded by defendant, wide latitude is permitted in the development of motive. *State v. Brown,* 360 Mo. 104, 227 S.W.2d 646, 652 (1950). Motive is not an element of the crime, but is instead only a circumstance for consideration by the jury. *State v. Selman,* 433 S.W.2d 572, 575 (Mo.1968). The introduction of evidence regarding Carol Reason's banking transactions served to establish that she had access to large sums of money at the time of the incident. The trial court did not abuse its discretion in finding the evidence relevant to the state's theory of the case, that defendant was hired by Carol Reason to murder her husband, in that the jury could reasonably infer motive from this evidence.

Judgment affirmed.

DOWD, P.J., and CRIST, J., concur.