STATE of Missouri, Plaintiff–Respondent,

v.

Shawn C. HANNA, Defendant–Appellant.

No. SD 31178.

Missouri Court of Appeals, Southern District, Division Two.

June 12, 2013.

Susan L. Hogan, Kansas City, MO, for appellant.

Gregory L. Barnes, Jefferson City, MO, for respondent.

**DON E. BURRELL, J.**

A jury found Shawn C. Hanna ("Defendant") guilty of first-degree murder for the November 2003 shooting death of his father, Ralph Hanna ("Father").[1] The State did not seek the death penalty, and Defendant was sentenced by the trial court to life in prison without the possibility of parole. *See* sections 565.020.1 and .2.

In two points relied on, Defendant appeals his conviction on the grounds that: (1) "the [S]tate's evidence did not establish beyond a reasonable doubt that [Defendant] was involved in any of the events that resulted in the death of [Father]"; and (2) the trial court abused its discretion in admitting evidence of "spending and debt" by Defendant's mother, Denise Hanna ("Mother"), because it was "not relevant to the issue of whether [Defendant] fired the shots that killed [Father]" and the "details about [Mother's] finances were prejudicial to [Defendant] but had no probative value."

Finding no merit in either of Defendant's claims, we affirm.

## Applicable Principles of Review

When reviewing a challenge to the sufficiency of the evidence to support a jury's verdict, we

> must determine whether sufficient evidence permits a reasonable juror to find guilt beyond a reasonable doubt. *State v. Belton,* 153 S.W.3d 307, 309 (Mo. banc

---

1. "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." Section 565.020.1. The jury also found Defendant guilty of armed criminal action, *see* section 571.015, but after the verdict was received and before evidence was presented to the jury for its determination of punishment, the State announced the dismissal of this count. Two previous trials in this matter ended in mistrials when the juries involved were unable to reach a verdict. The instant trial was held in Howell County after a transfer of venue from Carter County. Defendant's points do not challenge the sufficiency of the State's evidence to prove that the shooting was intentional and that it was done after deliberation. All statutory references are to RSMo 2000.

2005). "The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict." *Id.* "This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *State v. Miller,* 372 S.W.3d 455, 458 (Mo. banc 2012). In reviewing the sufficiency of the evidence supporting a criminal conviction, an appellate court "does not act as a 'super juror' with veto powers," but "gives great deference to the trier of fact." *Id.*

*State v. Wright,* 382 S.W.3d 902, 903 (Mo. banc 2012).

An appellate court cannot "reweigh the evidence." *State v. Ware,* 326 S.W.3d 512, 529 (Mo.App. S.D.2010). The jury is the sole determiner of the credibility of all witnesses, and we regard any conflicts in the witnesses' testimony to have been resolved by the jury in a manner consistent with its verdict. *State v. Pond,* 131 S.W.3d 792, 794 (Mo. banc 2004). "A jury may accept part of a witness's testimony, but disbelieve other parts." *Id.*[2]

"The standard of review for the admission of evidence is abuse of discretion." *State v. Reed,* 282 S.W.3d 835, 837 (Mo. banc 2009). "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Smith,* 314 S.W.3d 802, 807 (Mo.App. E.D.2010). "Further, with respect to the admission of evidence, appellate courts review for prejudice, not mere error, and reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Norman,* 243 S.W.3d 466, 471 (Mo.App. S.D.2007).

## Facts and Procedural Background

Sometime before Father was shot, Defendant's friend, Jason Hays, was in Defendant's hotel room at the Three Rivers Inn ("the hotel") when Mother came over and spoke with Defendant in his presence. Hays did not recall Mother's exact words, but his understanding of what she said was that "she's gonna do it or have somebody do it for him." Hays understood Mother's use of "it" as a reference to "killing." Hays left.

Defendant had two rooms at the hotel, 101 and 310. Hays had stayed in both rooms at different times. Hays had noticed on a regular basis a black rifle case in Room 101. The case was kept out in the open, along with other firearms, but he had not seen inside the case. At trial, Hays identified State's Exhibit 26, a photograph of a gun case that was subsequently admitted into evidence, as depicting "the gun case [he] saw out in the open in [Defendant's] room[.]"[3]

On another occasion, Hays was present when Defendant went to see Mother about getting money from her before paying for

---

2. Our summary of the relevant evidence will be presented in accordance with these principles.

3. None of the exhibits referenced in this opinion have been deposited with this court. "When an exhibit is omitted from the transcript and is not filed with the appellate court, the intendment and content of the exhibit will be taken as favorable to the trial court's ruling and as unfavorable to Defendant." *State v. Creech,* 983 S.W.2d 169, 171 (Mo.App. E.D. 1998).

repairs to "a four-wheeler[.]" Bootheel Buggies completed a $1,089.90 repair on a four-wheeler for Defendant on October 26, 2003. Defendant paid for the repair on November 12, 2003 by taking a credit-charging document from the business to Mother for her signature, as the charge was in Mother's name, and Defendant brought it back, signed.

In the second week of November 2003, Defendant told his girlfriend, Kristin Eads ("Girlfriend"), that "his parents were having some problems" and that "[M]other had asked him to kill his father."

At the time of the murder, Cattleya Bradbury—who was Father's daughter, Defendant's half-sister, and Mother's stepdaughter ("Half–Sister")—lived in Poplar Bluff, which she said was about 30 to 40 minutes away from the Hanna's residence in Ellsinore. Half–Sister testified (over Defendant's continuing objection) that Mother had been wiring money to Defendant's brother, Philip Hanna ("Brother"), who lived in Colorado, because his business was not "doing too well[.]" Half–Sister had also wired money to Brother on two occasions at Mother's request, and she thought the amounts were "maybe" $5,000 and $2,000. Mother used credit cards to obtain the money, and some of the credit card mail was coming to Half–Sister to be delivered to Mother.

Half–Sister did not tell Father "about the problems[.]" Half–Sister was aware that Father had life insurance policies on himself of $50,000 and $25,000. Mother drove "a four-door white Oldsmobile" in November 2003, and Defendant drove "an older model, like goldish Mercedes." Half–Sister identified photographs admitted as State's Exhibits 17, 18, and 19 as pictures of Defendant's Mercedes. She identified photographs admitted as State's Exhibits 21, 22, and 23 as pictures of Mother's car. Girlfriend described Defendant's car as "an older Mercedes and it was a light color, like a light silverish, gold color" with "tinted windows in the back and the sides[.]"

Father's birthday was November 16th. On November 15, 2003, Defendant spent the night with Girlfriend at her mother's house in Williamsville, which was about twenty minutes "northeast of Ellsinore" and about fifteen miles "northwest of Poplar Bluff[.]" Defendant told Girlfriend that "he would be hunting the next morning" near K highway, but Girlfriend had "no idea" where that was located. The grandfather clock chimed 5:00 a.m. "right after" Defendant left Girlfriend's mother's house the next morning, November 16, 2003.

About 7:00 a.m. that same morning, Michael Cates left his farm located "[a]bout 2 miles northwest of Ellsinore on Route N" to go into town. His farm was located "[a]pproximately a mile west of [the Hanna residence] on Route N[,]" and it had a driveway that was "approximately a quarter of a mile long" "up a hill" and "with a curve[.]" Cates noticed "a Mercedes–Benz" parked "[j]ust off of Route N in the entrance of the driveway" as he went to town. He did not see "a lot" of Mercedes vehicles in that area. "The car had dark tint windows, very dark tint on the side and rear glass" and was missing its front license plate. Cates could not tell the color of the car as shown in the State's photographs, but he said that the car in the photographs had the same "features" as the one that he saw in the entrance of the driveway.[4] When Cates returned to his farm at approximately 7:45 a.m., the

---

4. A Missouri State Highway Patrol ("MSHP") investigator, Don Windham, testified that the color in the photographs "didn't come out very good."

Mercedes was still there. On both occasions, the Mercedes was unoccupied.

Donald Fann lived "[d]irectly east" of the Hannas on Highway N, about "[t]wo hundred fifty to 300 yards, about a football field" from the Hanna residence. The area around his house and the Hannas' property was "kind of hilly[.]" At "[a]lmost 8 o'clock [a.m.] sharp[,]" Fann "heard a gunshot[.]" He placed the time by "the changing of a [television] program [that] was coming on" and the time shown on his three "Dale Earnhardt clocks" that he had on the wall. The shot sounded like one made by a "[h]igh-powered rifle. Extremely loud." Fann went outside. He estimated that it took him "[p]robably 20, 30 seconds" to get outside from his bedroom. Within 30 seconds of getting outside, he "heard a second shot." "It sounded exactly like the first." Fann was "90–some percent sure" that this shot came "from near the Hanna residence."

"[A] little bit" after Cates returned from town, he went back down his driveway, and the unoccupied Mercedes was still there. While Cates looked on, he saw a white car come down the road and pull in behind the Mercedes. A person got out of the white car and got into the driver's side of the Mercedes. The white car then backed out and went east towards Ellsinore. The Mercedes backed out and went west towards Highway 60. Cates described the person who got into the Mercedes from the white car as "appear[ing] to be a Caucasian. Not [an] overly tall person, judging by the way they stood beside the car." Cates identified State's Exhibits 21, 22, and 23 as depicting a car "similar" to the one he saw pull in behind the Mercedes.

Ted Reynolds, the chief deputy for the Carter County Sheriff's Department at the time, received a report of "a shooting at the Hanna residence" at approximately 8:40 that morning, and he went to the scene. Fann recalled hearing sirens "[s]ome 30 minutes, 45 minutes" after he heard the second shot.

Lisa Schaffer lived "[a]cross the highway" from the Hannas, and although Schaffer did not know the Hannas very well, Mother called her on the morning of the shooting. Schaffer's "caller ID" noted the time of the call as coming in at 8:43 a.m. Mother told Schaffer "that her husband had been shot and he was in the backyard, and [Mother] was frantic sounding and she said she called the police and she needed us." Schaffer and her husband met Mother in Mother's driveway. Mother "said that she hadn't been out into the yard yet but [Father] was laying [sic] out in the backyard." Schaffer went into the backyard and saw Father lying face down in the portion of yard that was clear of trees. Schaffer, who "had had EMT training years ago[,]" rolled Father over and checked his wrist and neck for a pulse. Finding none, she believed that Father—whose "eyes were open and fixed"—was dead.

A forensic pathologist, Dr. Russell Deidiker, later determined that Father died from a gunshot wound. The fatal bullet entered Father's body from the left side of his chest and exited through the right, "obliterat[ing] the heart[.]" Dr. Deidiker determined that the shot would have been fired from "[s]ome form of high-powered, high velocity weapon" by a shooter located to Father's "left, slightly behind him, and slightly elevated[.]"

At about 9:00 a.m., Cates went into town to have breakfast with some friends who had "come down to deer hunt on the farm[.]" As they drove by the Hanna residence, Cates saw "all the emergency vehicles" and a white car "very similar" to the one he had seen pull up behind the

Mercedes in his driveway earlier that morning.

After Defendant left to go "hunting," Girlfriend fell back asleep. Defendant came back "a little bit after 9 a.m." when Girlfriend was making breakfast for her daughter. Defendant told Girlfriend that "he saw an 8–point buck. He said he had misfired, shot again, and missed the buck." Defendant was wearing "camouflage and his hunting clothes[,]" but "[h]e did not have any orange on when he came in the house." Defendant changed his clothes. Approximately "15 or 20 minutes" later, Defendant "came out of the room and said he had a voice mail on his phone." He told Girlfriend "that it was a call from his neighbor, that his father had been shot." Defendant "acted fairly calm." Defendant asked Girlfriend to take him "out there," and she took Defendant to the Hanna residence in her car, a black Mercury Cougar. MSHP Investigator, Scott Stoelting, testified that it would take "approximate[ly] 20 to 25 minutes" to travel from the Hanna residence to where Girlfriend was staying on the day of the murder.

Father was wearing "coveralls and an orange vest" when he was shot. His body was lying an estimated 40 yards from the trees that lined the edge of the property. A rifle, a walkie-talkie, an orange hat, and eye glasses lay near Father's body. A bullet fragment, along with some cloth and skin, was embedded in the walkie-talkie. Mother told Reynolds that her husband had been coming back from deer hunting that morning when they heard a shot. Father told her on the walkie-talkie that he would " 'find out what's going on.' " Then "another shot rang out[,] and [Father] fell to the ground."

Windham obtained permission to search Defendant's 1987 Mercedes. When he did so, he found that it was missing its front license plate. Inside the car, Windham found "a Western Union receipt that was for $100 from [Defendant] to [Brother,]" along with phone records for both Defendant and Mother. An orange vest and hat were also inside the Mercedes.

Stoelting met with Defendant on November 20, 2003. Defendant told Stoelting that he was staying in Room 310 at the hotel, and he gave Stoelting permission to search that room. Windham joined the meeting, and Defendant "looked kind of shocked like" when Windham asked Defendant about another room, Room 101. Defendant also consented to a search of that room, which Windham conducted.

Inside Room 101, Windham located an identification card for Defendant that stated Defendant was 5′ 7″ tall. He also observed a black powder rifle, and he seized "a box of 7–millimeter Magnum rounds[.]" At first, Windham did not think anything could be located under the bed because it had "wooden sideboards that [went] down to the floor," but Stoelting suggested lifting "the mattresses." When they did so, they found and seized a rifle case that contained a "Savage model 110 7–millimeter rifle" with scope. The rifle was admitted into evidence as State's Exhibit 47. Windham identified State's Exhibit 26 as depicting the rifle case found under Defendant's bed.

David Warren, a criminalist, testified for the State. He examined "a deformed projectile bullet" ("the bullet") recovered from the walkie-talkie found near Father's body, and he determined that a portion of the bullet had broken off. Based upon the degraded condition of the bullet, it could only be classified as falling "between two calibers, the class of a 27 and 28." Warren explained that "the 28 caliber class" included a "284 caliber [bullet]" and "[a] 284 is the same as a 7–millimeter." As a result, the "weapon that fired that [bullet] would be 270, 284, or 7–millimeter[.]" The bullet

was partially imprinted with rifling marks from the barrel of the gun from which it had been fired. From that imprint, Warren calculated the full number of rifling marks that "should be imprinted around the circumference of th[e] bullet." Warren also determined the twisting direction of the rifling marks.

Warren test-fired the rifle seized from Defendant's hotel room with 7–millimeter ammunition adjusted to fire at a lesser power for testing purposes. Because the "general rifling characteristics" of the test bullets "were the same" as those on the bullet, the rifle could not be eliminated as the weapon used to kill Father. Because "a lot of [the] unique, individual characteristics" expected to result from actual contact with a particular rifle barrel had been lost as a result of the deformation of the bullet, Warren could not definitively say that Exhibit 47 was the murder weapon.

Another MSHP investigator, Dennis Overbey, testified—over Defendant's continuing objection—that he gathered records concerning "at least 15 different credit cards and three personal loans from banks" involving Mother, some of which also involved Father. In some instances, it appeared that "one credit card [was used] to pay off another credit card[,]" and "[a] lot of the cash advances from different credit cards were going to a bank in Trinidad, Colorado." Some went directly to a restaurant associated with Brother. The total outstanding amount owed on charge accounts, standard loans, and credit cards was $123,251.

After Defendant was arrested for the murder, Girlfriend visited him at the jail on about four occasions. On one of those occasions, Defendant asked Girlfriend "if he could stay at [Girlfriend's] mother's house with [her]" if he was able to bond out of jail. Girlfriend told Defendant that her "mother said he could only stay there if he was to tell her what happened, the truth about everything that had happened." Defendant told Girlfriend "that there's no way he could tell [her] mom what had happened."

During another jail visit, Defendant told Girlfriend "that he was there on a hunting accident and [Girlfriend's] testimony and [Hays's] testimony was keeping [Defendant] there and he had asked [Girlfriend] to change it and to ask [Hays] to also change his." Girlfriend "told him no[.]" Hays also visited Defendant in jail, and Defendant "asked [Hays] to change [his] story."

Half–Sister received "maybe three" letters from Defendant while he was in jail, and she packed them away after "read[ing] maybe one[.]" Later, Half–Sister "found them in a box[,]" read them "in detail[,]" and called the police.[5] She identified State's Exhibit 60 as the letters she had received from Defendant. When she visited Defendant at the jail, she "asked him what happened and he just said he couldn't tell [her]." A forensic consultant for the State compared State's Exhibit 60 with a handwriting exemplar obtained from Defendant, and he opined that "the letters were positively identified ... to" Defendant.

The prosecutor then read to the jury the following portion of one of the letters dated November 28, 2003:

I'm sorry for everything. I don't think you'll ever know how sorry I am because you'll probably never see me again after

---

5. Half–Sister testified, "I didn't find the letters until after all the hearings. I mean, the last hearing." She agreed that this would have been after November 2006. The legal file reflects that the first trial that ended in a mistrial was held in February 2005, and the second was held in November 2006.

I go to trial. I just wanted to write this letter to tell you how sorry I am. I wish you could really understand how sorry I am. Maybe someday you will honestly and truly forgive me. I hope you like Kristin because even after I'm gone, I hope you love—you two will still be sisters at least that's one thing I can give you. I want to marry her before the trial but I don't know yet. Hopefully I'll get bonded out so I can live a little before I get my punishment which I understand I deserve.

After deliberating, the jury found Defendant guilty of both counts.

Defendant's motion for new trial asserted, *inter alia*, that the trial court erred in admitting evidence concerning Mother's finances and Father's life insurance policies as "collateral to the issues at hand[.]" Defendant also asserted that the admission of the financial records "was more prejudicial than probative" and that use of the records to establish motive was "faulty[.]" The trial court denied the motion and sentenced Defendant as set out above. This appeal timely followed.

### Analysis

*Point I—Verdict Supported
by Sufficient Evidence*

Defendant's first point contends the trial court erred in overruling his "motions for judgment of acquittal at the close of the [S]tate's case and at the close of all the evidence[,]" and thereafter sentencing Defendant based upon the verdicts, "because the [S]tate failed to prove [Defendant] guilty beyond a reasonable doubt[.]" Specifically, Defendant argues that "[i]t was not in dispute at trial that [Mother] wanted to kill [Father] . . . and [she] tried to recruit [Defendant] to help her[,]" but "none of the [S]tate's evidence showed beyond a reasonable doubt that there was any participation by [Defendant]." We disagree.

While Defendant concedes "that some of the [S]tate's evidence pointed toward [him]," he argues that it was insignificant in light of certain inferences he draws that are inconsistent with the jury's verdict.[6] Our standard of review requires us to ignore these contrary inferences. *Wright*, 382 S.W.3d at 903. The question is not whether the evidence could have supported a different outcome; it is whether the evidence was sufficient to permit the jury to "reasonably find the issue in harmony with the verdict." *State v. Gomez*, 863 S.W.2d 652, 655 (Mo.App. W.D.1993).

In assessing the sufficiency of the evidence supporting Defendant's conviction, we keep in mind that "[c]ircumstantial evidence alone can be sufficient to support a conviction[,]" *State v. Wilson*, 359 S.W.3d 60, 66 (Mo.App. W.D.2011), and "[a] permissible inference of guilt may be drawn from the acts or conduct of a defendant, subsequent to an offense, if they tend to show a consciousness of guilt and a desire to conceal the offense or a role therein." *State v. Isa*, 850 S.W.2d 876, 894 (Mo. banc 1993).

Here, the following circumstantial evidence presented at trial was sufficient to allow a reasonable juror to conclude that Defendant was the person who shot Father. The bullet that killed Father was in the range of calibers between the class of a .27 and a .28. The 28 caliber class includes a "284 caliber [bullet]," which is "the same as a 7–millimeter." A 7–millimeter rifle

---

**6.** Two examples are: Mother "also had access to .7 mm rifles" and "[t]here was no ballistics evidence introduced at trial as to whether [Mother's] weapons could have fired the fatal shot"; and Cates thought that the car he saw was a Buick, but Mother's car was an Oldsmobile.

recovered from under Defendant's mattresses could not be eliminated as the firearm that fired the partial bullet recovered from the walkie-talkie near Father's body.

Based upon the fact that Defendant had only recently concealed his 7–millimeter rifle, the look of "shock" on Defendant's face when Windham asked him about having the second hotel room where it was concealed, and Defendant later asking Hays to "change" his testimony, the jury could reasonably conclude that Defendant had hidden the rifle to keep law enforcement from discovering the murder weapon. *See Isa*, 850 S.W.2d at 894.

The jury could reasonably infer that Defendant's unoccupied Mercedes was parked in Cates's driveway about a mile west of the Hanna residence at 8:00 a.m. when Fann heard the first gunshot. Based upon Cates's observation of a white car pulling in behind the Mercedes and a "[n]ot overly tall person" leaving the white car and getting into the Mercedes, the jury could reasonably conclude that the person changing vehicles was Defendant returning to his vehicle after shooting Father.

From testimony provided by Stoelting, Half–Sister, and Girlfriend, a reasonable juror could conclude that Defendant had sufficient time to shoot Father, ride with Mother the one-mile distance back to his Mercedes, and hide the murder weapon beneath the bedding in his second hotel room in Poplar Bluff before returning to Girlfriend's location "a little bit after 9 a.m." Although there was orange clothing in Defendant's Mercedes, Defendant was not wearing any orange when he returned to Girlfriend's location from his "hunting" trip, and Defendant did not want to drive his Mercedes to the Hanna residence. The jury could reasonably believe that Defendant was not wearing the orange clothing on the morning of the murder because he did not want to be visible while in the elevated tree-line surrounding Father's yard, and he rode back to the residence in Girlfriend's car to avoid the risk that someone there might recognize his Mercedes.

Defendant also made statements after the shooting that demonstrated his consciousness of guilt. *See Davis*, 32 S.W.3d at 610. When trying to determine whether he could stay with Girlfriend's mother if released from jail, Defendant said there was "no way" he could tell her what had happened as a condition for his staying there. He asked Girlfriend and Hays that their testimony was keeping him in jail and asked them to change it. Defendant told Half–Sister that he "wanted to write … and tell [her] how sorry" he was and expressed his hope that she could possibly forgive him "someday[.]" More damning yet was the reason he gave for wanting to be released: "so I can live a little before I get my punishment which I understand I deserve."

The jury's determination that Defendant was "involved in" the events that resulted in Father's death was supported by sufficient evidence. Point I fails.

### Point II—No Abuse of Discretion in the Admission of Evidence Regarding Mother's Financial Condition

■ Defendant's second point contends the trial court abused its discretion in admitting "evidence of [Mother's] spending and debt" when it "was not relevant to the issue of whether [Defendant] fired the shots that killed [Father]" and the "details about [Mother's] finances were prejudicial to [Defendant] but had no probative value." The only specific financial evidence identified in the point is "evidence that [Mother] had been sending money to

[Brother] in Colorado and had over $120,000.00 in debt."[7]

Defendant asserts there was no evidence indicating that Defendant knew either that Mother had "financial difficulties" or that she had been sending money to Brother. Defendant was granted a continuing objection at trial on the ground that evidence about Mother's financial situation was "collateral," and he properly carried that particular claim forward by raising it again in his motion for new trial.

"The trial court has broad discretion respecting the relevance and admissibility of evidence." *Norman,* 243 S.W.3d at 471. "A trial court's ruling on the admissibility of evidence will be upheld if it is sustainable under any theory." *State v. Pascale,* 386 S.W.3d 777, 780 (Mo.App. E.D.2011). Generally, "[e]vidence must be both logically and legally relevant to be admissible." *State v. Rios,* 314 S.W.3d 414, 421 (Mo.App. W.D.2010). Here, because Defendant's trial objection and motion for new trial claimed that the evidence was "collateral," and his point on appeal asserts that the challenged evidence had *no* probative value, we accordingly limit our review to determine whether the evidence challenged by Defendant was logically relevant to the State's case.[8]

The State argues that the evidence of Mother's spending and debt was relevant to its theory that Mother had solicited Defendant to murder Father and "went directly to the motive for the conspiracy between Defendant and [Mother] to kill [Father.]" We agree.

"Evidence of motive is logically relevant and admissible even where motive is not an element of the crime charged." *State v. Young,* 367 S.W.3d 641, 647 (Mo. App. E.D.2012). "[W]ide latitude is permitted in the development of motive." *State v. Washington,* 707 S.W.2d 463, 469 (Mo.App. E.D.1986).

Defendant asserts that "[t]he only evidence linking [Defendant] in any way to [Mother's] financial dealings was that she paid Bootheel Buggies for repairs to [Defendant's] four-wheeler" and "there was no evidence that [Mother] paid for the repairs as a way to encourage [Defendant] to help her kill [Father]." Defendant does not explain why the jury could not have reasonably considered this as circumstantial evidence of what, at least in part, motivated Defendant to kill Father. *Cf. Washington,* 707 S.W.2d at 469 (banking transactions of coconspirator were relevant to State's theory that defendant was hired by coconspirator to commit murder); *see also*

7. In his argument, Defendant discusses other evidence from Half–Sister's testimony that Father had two life insurance policies totaling $75,000 in value and that her husband located a third life insurance policy for Father valued at $100,000. Defense counsel specifically objected to a question to Half–Sister inquiring whether her husband told her something when he returned to the funeral home from Father's residence. The trial court instructed the jury that it could "receive the evidence only to show a subsequent action, not for the truth of any statement." Half–Sister then testified that her husband returned with a $100,000 life insurance policy that she did not know about. We do not review the admissibility of testimony regarding any of the three policies because such a claim was

not set forth in the point relied on, and the argument following Point II did not articulate a specific theory of inadmissibility. *See State v. Irby,* 254 S.W.3d 181, 195 (Mo.App. E.D. 2008) (arguments not in points relied on or not developed with argument and authority are deemed abandoned).

8. Even if Defendant had challenged the evidence based on its legal relevancy, Defendant has failed to demonstrate how any prejudicial effect outweighed its probative value to establish motive. Defendant simply makes a bare assertion that the prejudicial effect of the evidence was "overwhelming"; he cites no fact or law demonstrating such prejudice.

*State v. Matheny,* 860 S.W.2d 837, 838–39 (Mo.App. E.D.1993) (evidence of previous charges against coconspirator involving victim was admissible to show that defendant's purpose in kidnapping victim was to prevent prosecution of coconspirator).

Point II is denied, and the judgment of conviction and sentence is affirmed.

DANIEL E. SCOTT, P.J. and
JEFFREY W. BATES, J., Concur.