

# Missouri Court of Appeals
## Southern District

### In Division

STATE OF MISSOURI,                      )
                                           )

      Plaintiff-Respondent,           )

                                           )

vs.                                     )          No. SD37406

                                           )

CHRISTOPHER BROCK MANUEL,               )          **Filed:  January 3, 2024**

                                           )

      Defendant-Appellant.            )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

The Honorable Calvin R. Holden, Judge

### <u>AFFIRMED</u>

Christopher Brock Manuel ("Mr. Manuel") appeals from a Greene County Circuit Court judgment convicting him of murder in the second degree and armed criminal action following a bench trial.  Mr. Manuel claims in his sole point on appeal that the trial court erred in admitting recorded jail calls that occurred between Mr. Manuel and his ex-girlfriend ("Ex-Girlfriend") while he was in custody awaiting trial.  Because the phone calls were both logically and legally relevant, the trial court did not abuse its discretion by admitting them into evidence.  The trial court's judgment is affirmed.

## Factual Background and Procedural History

On November 29, 2017, Mr. Manuel was charged by felony information with murder in the second degree and armed criminal action related to the death of Victim on September 23, 2017. Mr. Manuel waived his right to jury trial, and the case proceeded to a bench trial on November 8, 2021. Viewed in the light most favorable to the judgment, the evidence at trial was as follows.

On September 23, 2017, Mr. Manuel went to a rental house owned by Victim in Republic, Missouri. After arriving at the house, he texted Victim, "I'm here. I'll wait for you, buddy." At some point later, an elderly couple noticed Victim and Mr. Manuel "scuffling" outside the house as they were driving home. The driver saw that Mr. Manuel had one arm around Victim and the other arm going towards Victim's midsection. Victim appeared to be seven or eight inches shorter than Mr. Manuel. When the driver honked her truck's horn, Mr. Manuel froze in motion, and Victim fell to the ground. Mr. Manuel "took off running" once Victim fell. Victim told the driver to call 911 and yelled, "I'm dying." When the driver asked who did this to him, Victim said, "Chris."

Responding officers found Victim lying on the ground surrounded by multiple people. Victim was actively bleeding from his upper left arm, which squirted every time his heart beat. He was in and out of consciousness, and an "unbelievable" amount of blood was "absolutely gushing" out of Victim. Investigating officers noted Victim's blood appeared in a trail leading from the house to where Victim was lying. They found the house's interior in disarray. Furniture was turned over, and trash was everywhere.

Emergency response personnel took Victim to a hospital, but he died from his injuries. Victim had seven to nine stab wounds, at least three incised wounds, and other wounds which could not be specifically characterized. A medical examiner documented one incised wound on the back of Victim's head; two stab wounds in his back with one close to his spine; one stab wound in his left bicep that pierced the brachial artery; and other stab wounds on the left side of his chest, under his armpit, just next to his sternum, and in his abdomen. Victim's defensive wounds on his left and right forearms indicated he tried to prevent a "sharp force from contacting [his] body."

Victim's wife provided Victim's cell phone to police. She told police that a few days earlier she received a text from Mr. Manuel, addressed to Victim, asking if he could stop by. She responded to the text by providing Victim's phone number to Mr. Manuel. When a police detective reviewed Victim's cell phone, she found the text from Mr. Manuel that said, "I'm here. I'll wait for you, buddy."

The police detective obtained a search warrant for Mr. Manuel's home, located approximately 200 feet from the crime scene, and Mr. Manuel was arrested outside of his residence. The police detective found a knife in Mr. Manuel's home with Victim's blood on it. While Mr. Manuel was in custody outside of the residence, the detective also observed and photographed a laceration above his left elbow. Mr. Manuel offered that the injury was "from being up in the rafters." He later admitted at trial that his explanation for the injury was a lie.

The State charged Mr. Manuel with one count of murder in the second degree for killing Victim by stabbing him and one count of armed criminal action for committing

3

murder with a dangerous instrument. *See* sections 565.021 and 571.015.[1] At trial, the

State admitted a letter written by Mr. Manuel regarding a human trafficking ring he

believed existed. Mr. Manuel had inadvertently placed the letter in an incorrect mailbox

of a Republic residence. In the letter, he talked about "the girls" and told the reader,

"[w]e have to infiltrate and kill top down." Mr. Manuel also wrote, "I have to reserect

[sic] the old me" and explained it was "[n]ot the first time I've killed him[.]"[2] He ended

the letter with, "Brooke is dying. Let[']s move[.]" Under the State's cross-examination,

Mr. Manuel explained that Brooke was the sister of Danielle, a "childhood friend" of his.

Mr. Manuel believed both women to be victims of the supposed human trafficking ring.

Mr. Manuel admitted that his goal was to "put a stop to" the human trafficking ring and

"collect as much information as [he] could" in order to "kill the operation."

B.F., an acquaintance of Victim, testified at trial as a witness for the State. He

explained there was an incident about a week or two prior to the murder when Mr.

Manuel appeared at his house asking for Victim. B.F. asked why he was looking for

Victim, and Mr. Manuel said he had "[l]ike $4,000" to give to him. Mr. Manuel said that

if he was unable to locate Victim, he could leave the money with B.F. B.F. replied, "If

you leave it with me, I'm going to go to the casino and blow it." Mr. Manuel told B.F.

that was "a good way to get killed." As they continued talking, Mr. Manuel said, "he had

two girls, whatever, that [Victim] wanted to take -- get rid of one and said he took one of

them out to the lake and got rid of the body." Mr. Manuel then wanted to "go somewhere

---

[1] All statutory references are to RSMo 2016, including applicable changes effective January 1, 2017, unless otherwise specified.

[2] It is not clear from the record who "him" referred to in this instance.

4

private" with B.F. to continue the conversation. When B.F. refused, Mr. Manuel started getting loud and drawing attention. Mr. Manuel left shortly thereafter and said "he was going to come back and kill everybody in the house."

The State moved to admit Exhibit 109 into evidence, which contained six separate audio files, one for each of six different jail phone calls between Mr. Manuel and Ex-Girlfriend on six separate dates. During one phone call, Mr. Manuel referenced "Danielle's sister" being held "hostage on that river." He also made statements that, "what happened, happened" and "it happened from behind." When Ex-Girlfriend described the public reporting on Victim as having "too many" marks on his chest, Mr. Manuel replied, "That number is not correct." Referencing Victim, Mr. Manuel said, "In the obituaries, this [Victim] guy? Cremated, twenty-four hours later. Are they gonna do a trial against a piece of paper?" Ex-Girlfriend later told Mr. Manuel, "This has got to end here" and "it's over[.]" She told Mr. Manuel his daughter was "worth it" enough to stop and, "there's nothing you can do no more." Mr. Manuel responded that "all the other girls" were worth it too and asked Ex-Girlfriend, "Do you think it's over for her?"

In another recorded conversation, Ex-Girlfriend told Mr. Manuel that he "shouldn't have done what he did," and he replied, "Well, I agree. But I'd do it again." On another occasion, Ex-Girlfriend told Mr. Manuel, "you did it" and he replied, "I know what I did. I know what I didn't do. And I know what happened, what didn't happen, okay?" When Mr. Manuel noticed Ex-Girlfriend seemed sad on another call, he told her, "It's okay. I'm here for a good reason. I'm here for a good cause." He also told Ex-Girlfriend that there were "extenuating circumstances" and "reasons" why he returned to Republic, Missouri.

5

Mr. Manuel stipulated to the foundation supporting the exhibit's admission but objected to its admission on the basis that the discussions on the phone calls were irrelevant. The trial court overruled Mr. Manuel's objection because "each call had some bearing to previous calls[.]" Mr. Manuel later testified in his own defense. He did not deny killing Victim, but asserted he did so out of self-defense. After considering all of the evidence, the trial court found Mr. Manuel guilty of murder in the second degree and armed criminal action. It sentenced him to life imprisonment for murder in the second degree and 20 years' imprisonment for armed criminal action, each sentence to run concurrently with the other.

## Analysis

Mr. Manuel's sole point on appeal argues the trial court abused its discretion when it overruled his objection and admitted Exhibit 109 containing Mr. Manuel's jail phone calls. Mr. Manuel claims the trial court erred by allowing the admission of his jail phone calls because they were not relevant, and, because they discussed uncharged misconduct, the prejudice of the evidence outweighed its probative value. Because the phone calls were both logically and legally relevant, we deny this point.

### *Standard of Review*

A trial court enjoys a great breadth of discretion to admit or exclude evidence, so this Court reviews a trial court's admission of evidence for an abuse of discretion. ***State v. Osborn***, 663 S.W.3d 891, 895 (Mo. App. S.D. 2023). "We will not disturb that broad discretion unless the ruling is against the logic of the circumstances and is so unreasonable as to show a lack of careful consideration[,]" ***id.***, and we will uphold the trial court's ruling on admissibility if it is sustainable under any theory. ***State v. Gott***,

6

523 S.W.3d 572, 582 n.8 (Mo. App. S.D. 2017). Reversal of the trial court's evidentiary discretion is warranted only if an error was so prejudicial it deprived the defendant of a fair trial. *State v. Norman*, 618 S.W.3d 570, 575 (Mo. App. W.D. 2020). "The test is whether the [supposedly] prejudicial improper admission was outcome-determinative." *State v. Ernst*, 164 S.W.3d 70, 75 (Mo. App. S.D. 2005) (quoting *State v. Love*, 134 S.W.3d 719, 724 (Mo. App. S.D. 2004)).

This abuse of discretion standard applies both in cases before juries and bench trials. *Compare State v. Taylor*, 466 S.W.3d 521, 528 (Mo. banc 2015) (applying the abuse of discretion standard in a jury-tried case) *with State v. Coaston*, 609 S.W.3d 527, 528 (Mo. App. S.D. 2020) (applying the same standard to evidence admitted in a bench trial). However, we also grant more latitude to a trial court's decision to admit evidence in bench-tried cases by presuming the trial court did not weigh erroneously-admitted evidence, unless the record shows the trial court actually relied on inadmissible evidence when making its findings. *Coaston*, 609 S.W.3d at 528. "Thus, it is 'nearly impossible to obtain a reversal based upon the improper admission of evidence in a court-tried case.'" *Id.* (quoting *State v. Franks*, 228 S.W.3d 607, 610 (Mo. App. S.D. 2007)).

*The Phone Recordings were Logically and Legally Relevant*

Admissible evidence must be both logically and legally relevant. *State v. Rodriguez*, 482 S.W.3d 444, 448 (Mo. App. E.D. 2016); *State v. Girardier*, 484 S.W.3d 356, 364 (Mo. App. E.D. 2015).

> Evidence is logically relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case.

7

*Girardier*, 484 S.W.3d at 364 (quoting *State v. Tisius*, 92 S.W.3d 751, 760 (Mo. banc 2002)). Evidence is legally relevant if its probative value outweighs the costs of potential prejudice, confusion, misleading the fact-finder, or cumulativeness. *Rodriguez*, 482 S.W.3d at 448. Evidence of uncharged crimes is generally not admissible to prove a defendant's propensity to commit the alleged crime. *State v. Hood*, 521 S.W.3d 680, 686 (Mo. App. S.D. 2017).

Mr. Manuel maintains the phone calls were not logically and legally relevant because they ranged from "conversations on family life to damning admissions to uncharged acts of assault and stealing[.]" We disagree. The jail calls between Mr. Manuel and Ex-Girlfriend were relevant to establish Mr. Manuel's involvement in the charged crime. Mr. Manuel named Victim in conversation, gave specific details about the attack, and confirmed he stabbed Victim. He described the encounter as "happen[ing] from behind." This statement, in conjunction with Victim's defensive wounds and stab wounds in his back, indicates the attack began while Victim was turned away from Mr. Manuel, which would support an inference that Mr. Manuel was the initial aggressor. In addition, Mr. Manuel disputed Ex-Girlfriend's description of Victim having "too many" stab wounds which further connected Mr. Manuel to Victim's death.

Mr. Manuel's phone calls were also relevant to support the State's theory for Mr. Manuel's motive and to rebut his claim of self-defense. "Evidence of motive is logically relevant and admissible even where motive is not an element of the crime charged." *State v. Hanna*, 420 S.W.3d 569, 578 (Mo. App. S.D. 2013) (quoting *State v. Young*, 367 S.W.3d 641, 647 (Mo. App. E.D. 2012)). Pleading self-defense, as Mr. Manuel did, in response to a violent criminal charge like murder "puts motive and intent squarely at

8

issue[.]" ***State v. Tolliver***, 101 S.W.3d 313, 315 (Mo. App. E.D. 2003). Throughout the first phone call, Ex-Girlfriend pleaded with Mr. Manuel to "end" it and repeatedly said, "[t]his has got to end here" and "it's over[.]" Ex-Girlfriend told Mr. Manuel that his daughter is "worth it[,]" to which Mr. Manuel responded, "but so are all the other girls." On another occasion, Mr. Manuel said, "Danielle's sister is being held hostage[.]" Mr. Manuel explained during cross-examination that he believed "Danielle" to be a victim of a human trafficking ring, and Danielle's sister, Brooke, was also mentioned in the letter Mr. Manuel attempted to circulate. This letter included descriptions of Mr. Manuel's plan to take down the human trafficking operation. Based on the connection between his letter and his statements during the phone calls, a finder of fact could infer Mr. Manuel was motivated to kill because of Victim's connection to an alleged human trafficking operation.

In yet another occasion, Ex-Girlfriend told Mr. Manuel, "there's nothing you can do no more[,]" and he replied, "Do you think it's over for her?" The trial court could have reasonably inferred the "her" Mr. Manuel was speaking of was someone he believed to be a human trafficking victim, and the attack on Victim was then linked to Mr. Manuel's motivation of rescuing this unidentified girl.

A defendant's declarations regarding consciousness of guilt are also admissible because they speak to the defendant's guilt of the charged crime. ***State v. Butler***, 642 S.W.3d 364, 370 (Mo. App. E.D. 2022); ***State v. Davidson***, 242 S.W.3d 409, 415 (Mo. App. E.D. 2007). Mr. Manuel told Ex-Girlfriend on the phone, "I know what I did. I know what I didn't do. And I know what happened, what didn't happen, okay?" Mr. Manuel also said he was in jail "for a good cause" and that he would "do it again." Mr.

9

Manuel contends these statements corroborate his self-defense claim, but his proffered interpretation did not foreclose the State from submitting the phone calls to support its own theory. *See Butler*, 642 S.W.3d at 371 (holding recorded jail phone calls were admissible as evidence of consciousness of guilt "because reasonable persons could differ as to the intended target of [the defendant's] threats"). Mr. Manuel's recorded statements were logically relevant to show he killed Victim to further the "good cause" of taking down an unproven human trafficking ring.

Mr. Manuel contends the phone recordings are not legally relevant because they contained inadmissible evidence of "uncharged misconduct" related to his participation in jailhouse fights. Evidence of uncharged crimes may be relevant to establish motive, intent, absence of mistake or accident, a common plan or scheme, or identity of the defendant. *State v. Blakey*, 203 S.W.3d 806, 811-812 (Mo. App. S.D. 2006). Such evidence may also be admissible if they are part of a sequence of events which, when considered together, present a more coherent picture of past events. *Id.* While the violence with jailhouse inmates had no direct connection to Victim's death, the probative value of the phone call recordings still outweighed the potential for undue prejudice or confusion. *See Butler*, 642 S.W.3d at 371 (finding recorded jailhouse threats to be admissible even assuming they were "wholly unrelated" to the charged offenses). Importantly, the State did not use the phone recordings to emphasize any jailhouse fights. It offered Exhibit 109 because Mr. Manuel's discussion of "good cause" and concern for "other girls" explained why Mr. Manuel killed Victim. Rather than add confusion, Exhibit 109 clarified why Victim's death was connected to Mr. Manuel's letter and his exchange with B.F. The phone recordings were both logically and legally relevant.

10

*The Phone Recordings were Not Prejudicial*

Even if the recordings of Mr. Manuel's jail phone calls were not admissible, he did not suffer any resulting prejudice from their admission. Mr. Manuel argues the phone conversations were prejudicial because, as he was asserting self-defense, any evidence that eroded his credibility was unduly prejudicial. This contention fails for one key reason: Mr. Manuel's decision to try his case before a judge, and not a jury, "has fundamental evidentiary implications." *State v. Taylor*, 504 S.W.3d 116, 122 (Mo. App. E.D. 2016). We presume the trial court did not give any weight to erroneously-admitted evidence in bench-tried cases, unless it is clear from the record the trial judge relied on inadmissible evidence. *Norman*, 618 S.W.3d at 575; *Coaston*, 609 S.W.3d at 528. To overcome this presumption, Mr. Manuel must show the challenged evidence "inflamed the fact-finder or diverted its attention from the issues to be resolved." *Osborn*, 663 S.W.3d at 896 (quoting *Ernst*, 164 S.W.3d at 75).

Mr. Manuel focuses on the following statement from the trial court to argue the trial court relied on inadmissible evidence:

> And I listened to all the evidence, looked at it - - actually, I spent probably more time on this case than almost any other case I've ever spent on a bench trial going through the evidence, listening to tapes, doing other things before I came to a decision[.]

Nothing in this statement indicates the trial court was "inflamed" or placed improper weight on uncharged acts included in the phone conversations. To the contrary, it reflects that the trial court expended considerable time reviewing the evidence, rather than rushing to judgment. Mr. Manuel points to nothing further, and nothing else in the record lends us to conclude the trial court relied on any evidence that may have been inadmissible. We additionally determine Mr. Manuel was not unduly prejudiced by the

11

trial court's decision to admit the exhibit containing the phone recordings given the other evidence admitted at trial. The trial court could have found Mr. Manuel guilty without considering the phone recordings because there was otherwise sufficient evidence of Mr. Manuel's actions and motive. *See* **State v. Dixon**, 495 S.W.3d 812, 820 (Mo. App. S.D. 2016) (presuming no prejudice from the admission of an exhibit when it was "not necessary to support any element of the crime" charged). There was no dispute Mr. Manuel killed Victim, and the State supplied other evidence of Mr. Manuel's motive through his letter and B.F.'s testimony. Mr. Manuel's self-defense claim was also weakened by the extent of Victim's injuries, Victim being seven or eight inches shorter than Mr. Manuel and hence less likely to be a threat, and Mr. Manuel running away once he was seen attacking Victim rather than explaining the situation. He further undermined his credibility by lying to police about his own wound and admitting he believed in an unfounded theory about a human trafficking ring.

Moreover, "[e]rroneously admitted evidence is not considered prejudicial where similar evidence is properly admitted elsewhere in the case or has otherwise come into evidence without objection." **Franks**, 228 S.W.3d at 610 (quoting **State v. Collis**, 139 S.W.3d 638, 641 (Mo. App. S.D. 2004)). Mr. Manuel did not object to the admission of his letter, which spoke to the unproven human trafficking operation and uncharged acts as well. Specifically, Mr. Manuel wrote, "I have to reserect [sic] the old me" and explained this would not be "the first time I[']ve killed him[.]" Because Mr. Manuel did not object to the introduction of these references to prior bad acts and the phone recordings' discussion of "girls" is similar to what Mr. Manuel included in the letter, the admission of the phone recordings was not prejudicial. Mr. Manuel's Point One is denied.

12

**Conclusion**

Mr. Manuel's recorded phone conversations from jail were relevant and not unduly prejudicial. The recordings refuted his self-defense claim by clarifying his motive to kill, lack of remorse, and consciousness of guilt. Mr. Manuel's belief in a human trafficking organization also connected the recordings to other record evidence. We determine the trial court did not improperly rely on inadmissible portions of the phone recordings. The trial court's judgment is affirmed.

JENNIFER R. GROWCOCK, J. – OPINION AUTHOR

DON E. BURRELL, J. – CONCURS

MARY W. SHEFFIELD, J. – CONCURS